Darwin Lee STARCHER, Plaintiff,

Kathy Brown, Individually as the sister of Casey Dale Starcher and as the administrator of the Estate of Casey Dale Starcher, deceased, Plaintiff–Appellant,

v.

CORRECTIONAL MEDICAL SYSTEMS, INC.; Hamilton County, Ohio; Simon Leis, Sheriff; Sally Remilard, Administrator of Correctional Medical Systems; Joseph Spriggs, Employee of Correctional Medical System, Defendants–Appellees.

No. 97–4298.

United States Court of Appeals, Sixth Circuit.

March 26, 2001.

Before JONES, BATCHELDER, and MOORE, Circuit Judges.

BATCHELDER, Circuit Judge.

Kathy Brown, the administrator of the estate of Casey Starcher, who killed himself while incarcerated at the Hamilton County, Ohio, Justice Center, appeals from the district court's order granting summary judgment to all defendants on her 42 U.S.C. § 1983 claim. She appeals as well several collateral orders of the district court. For the reasons set forth below, we affirm the judgment of the district court.

I

On September 10, 1993, Casey Starcher was arrested by the Cincinnati, Ohio, police and charged with receiving stolen property and unlawful possession of a firearm. While at the police station, Starcher

---

1. The first of these attempts was in 1991, when Starcher tried to hang himself with an electrical cord.

grabbed a police officer's gun and threatened to shoot himself. After subduing Starcher and taking the gun from him, the officers took him to University Hospital in Cincinnati, where it was determined that he was not suffering from a "major mental disease" and that he did not "show the signs and symptoms of any given mental disease."

Dr. Constance Logan, a forensic psychologist, examined Starcher in connection with the criminal proceedings against him. Dr. Logan found that Starcher was competent to stand trial and that he did "not meet the criteria of mental disease or a lack of knowledge of wrongfulness as a product of the mental disease." Furthermore, Dr. Logan determined that Starcher's actions at the police station were not the result of a mental disorder, but rather were the result of "a natural anxiety based on the extremely dangerous situation in which he had placed himself."

After Starcher pled guilty to the charges stemming from his September 10 arrest, he was assigned to the Warren Correctional Institute ("WCI"). There he was seen for the first time by staff psychologist Dr. Amy Hamilton on May 10, 1994. Although Dr. Hamilton was aware that Starcher had twice attempted suicide,[1] she determined that he was not now suicidal and should be placed in the general population of WCI. During the course of the next fourteen months, Starcher was seen by Dr. Hamilton on forty occasions. She found that Starcher was not "severely mentally ill," and he remained in the general prison population. Although during this time period Starcher received bad news on several occasions (e.g., his girlfriend had ended their relationship), Dr. Hamilton did not at any time find that he was suicidal.

While incarcerated at WCI, Starcher filed a motion to withdraw his guilty plea, and in July 1995, he was transferred to the Hamilton County Justice Center ("HCJC") pending a ruling on his motion. Before that transfer occurred, Dr. Hamilton informed Starcher that she wanted him to be housed in the Medical Unit of the HCJC because the Medical Unit "was more akin to what we have here [at WCI] in the general population" and "because it was quieter." On July 7, 1995, Dr. Hamilton made a telephone call to Correctional Medical Systems, Inc. ("CMS"), the contract provider of medical services to HCJC, asking as a "professional courtesy" that Starcher be placed in the Medical Unit at HCJC. Dr. Hamilton did not send any of Starcher's records to HCJC.

Starcher arrived at HCJC on July 10, 1995, where he was assessed by Joseph Spriggs, a behavioral specialist. Spriggs determined that Starcher was not suicidal, but assigned him to the Medical Unit in response to Dr. Hamilton's request. On three occasions between July 10, 1995, and August 3, 1995, Spriggs met with Starcher to assess his mental condition; each time Spriggs determined that Starcher was not suicidal. Spriggs also had contact of a less formal nature with Starcher on a near-daily basis and observed nothing that led him to believe that Starcher was suicidal.

On July 11, 1995, CMS employee Anne Shields performed a classification screening of Starcher. During that screening, Shields observed nothing that indicated Starcher was suicidal. On the same day, another CMS employee, Pam Cerveny, performed a mental health assessment of Starcher and, like Shields, observed nothing that led her to believe that Starcher was suicidal. On July 26, 1996, CMS employee Mitzy Mason participated in a phys-ical examination of Starcher and did not observe anything that indicated that Starcher was suicidal.

While he was incarcerated at HCJC, Starcher had regular contact with his step-sister, step-mother, two brothers, and a half-brother. None of these relatives believed that Starcher was suicidal, and none communicated any concerns about his well-being to CMS. Similarly, none of the corrections officers who had contact with Starcher at HCJC believed he was suicidal.

On August 3, 1995, Starcher's attorney, Teresa Cunningham, informed Dr. Hamilton by telephone that Starcher's motion to withdraw his guilty plea had been denied. In response, Dr. Hamilton advised her that HCJC should "use caution in dealing" with Starcher. Later that day, Cunningham met with Joseph Spriggs for "a couple of minutes" and told him that Dr. Hamilton thought that Starcher should be watched.[2] Cunningham did not say anything about suicide or a suicide watch.

Between 11:00 p.m. on August 3 and 6:00 a.m. on August 4, Starcher was locked in his cell. During that time, two corrections officers made rounds every half hour, and they did not notice anything unusual about Starcher. At some point during the night, Starcher covered himself with a blanket, placed a plastic bag over his head, and suffocated himself. His body was discovered by a corrections officer shortly before 6:00 a.m. on August 4, 1995.

Both Hamilton County and CMS have substantial policies directed at preventing inmate suicide. Hamilton County instructs all correction officers assigned to the Medical Unit in a lengthy curriculum of suicide prevention, detection, interven-

**2.** Spriggs denies that Cunningham relayed the psychologist's warning to him. Because this case is an appeal from summary judgment granted in favor of Spriggs and his co-defendants, we accept the allegation as true.

tion, and response. CMS has promulgated a written protocol relating to the management of potentially suicidal inmates. This protocol requires that inmates who demonstrate a risk for self-destructive behavior (including a history of suicide attempts or recent denials of release) be evaluated as soon as possible. If mental health staff determine that an inmate is in danger of immediate or delayed self-harm, the inmate is placed under suicide precautions, which involve near-constant observation. HCJC and CMS have successfully completed audits by both the National Commission on Correctional Health Care and the Ohio Department of Rehabilitation and Correction for compliance with standards that include guidelines on the prevention of inmate suicide. Prior to Starcher's death on August 4, 1995, there had never been a successful suicide attempt in the Medical Unit of the HCJC.

## II

Starcher's estate brought this § 1983 action, naming as defendants Hamilton County, CMS, Hamilton County Sheriff Simon Leis, Sally Remillard (the CMS administrator at HCJC), and Joseph Spriggs. The latter three defendants were named in both their official and individual capacities. The complaint alleged that the defendants had violated Starcher's constitutional rights in failing to prevent his suicide.

The pre-trial conduct of the case was fraught with problems. The troubles began with the estate's attempts to identify expert witnesses. Immediately prior to the deadline for identifying expert witnesses, the estate selected a corrections expert who had already been retained as a consultant by CMS, and the court granted the estate an extension of the expert-identification deadline. The estate then identified a second expert, but the defendants were never able to depose him, at first because he demanded advance payment of $3,500 in fees and expenses, and later be-

cause the estate had not conducted the discovery necessary for him to form his opinions. The court further extended the deadline twice, but on September 25, 1996, three weeks before the discovery deadline, the estate requested a fourth extension. The court refused, citing the potential for prejudice to the defendants, and noting that it had already gone to great lengths to accommodate the estate.

The problems in the case were compounded by the fact that the estate's attorney, Teresa Cunningham, was an important fact witness in the case because she had conveyed the message to Joseph Spriggs on August 3, 1995, that Starcher should be watched. The defendants therefore filed several motions that she withdraw as the estate's attorney. Finally, the court ordered Cunningham to make an unequivocal statement whether she would be a witness or continue as the estate's counsel. Cunningham refused, and the court disqualified her.

Cunningham's disqualification left Douglas Mansfield as the estate's sole counsel. Cunningham had represented to the court that Mansfield would undertake the representation of the estate, but Mansfield was at that time out of the country. On his return, Mansfield moved to withdraw as counsel, testifying at a hearing on that motion that he had agreed to assist in the case in only a very limited role and that he could not competently perform as counsel due to his busy schedule. The court granted the motion and vacated the trial date so that the estate could obtain new counsel.

During the course of the extensive and contentious motion practice involving, among other things, Cunningham's conduct, CMS asked that monetary sanctions be imposed on her. Cunningham moved that the district court judge, Sandra Beckwith, recuse herself because the judge had

invited the defendants to bring a motion for sanctions and because she had accepted Mansfield's version of the events that led to his motion to withdraw. The court denied the motion for recusal. Cunningham was eventually sanctioned in the amount of $29,000.

Seven months after the estate had obtained new counsel, the district court granted the defendants' motions for summary judgment, which by then had been pending for nearly a year. In its timely appeal, the estate challenges the grant of summary judgment, and the court's collateral decisions to disqualify Cunningham, to deny a fourth extension of the expert-identification deadline, to allow Mansfield to withdraw, to schedule an expert deposition when the estate was unrepresented (even though the deposition never took place), and to deny the motion to recuse.

### III

■ We review de novo a grant of summary judgment. *See Terry Barr Sales Agency, Inc. v. All–Lock Co.*, 96 F.3d 174, 178 (6th Cir.1996). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The court views the facts and all inferences drawn therefrom in the light most favorable to the nonmoving party. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When confronted with a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ The Eighth Amendment requires that prison officials "must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). An inmate who claims a violation of his Eighth Amendment rights based on a failure of the prison officials to prevent harm must make two showings: first, that he was incarcerated under conditions that posed a substantial risk of serious harm, and second, that the prison official had a sufficiently culpable state of mind—one of "deliberate indifference" to inmate health or safety. *See Williams v. Mehra*, 186 F.3d 685, 691–92 (6th Cir.1999) (en banc); *see also Farmer*, 511 U.S. at 834.

■ "Deliberate indifference," as it is used in the Eighth Amendment context, comprehends more than mere negligence but less than the purposeful or knowing infliction of harm. *See Farmer*, 511 U.S. at 836; *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Deliberate indifference requires that a prison official know of and disregard a substantial risk of serious harm to inmate health or safety. *See Farmer*, 511 U.S. at 837. The deliberate indifference standard is a subjective one. It is not enough that there was a danger of which a prison official objectively should have been aware. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

■ Hamilton County cannot be held liable under § 1983 on a respondeat supe-

rior or vicarious liability basis. *See Monell v. Department of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). For liability to attach against Hamilton County under § 1983, the plaintiff must show that *"deliberate* action attributable to the municipality directly caused a deprivation of federal rights." *Board of County Comm'rs v. Brown*, 520 U.S. 397, 415, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). The plaintiff must show that county policymakers made a "deliberate choice" among various alternatives and that the policy caused the injury. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Similarly, CMS, although clearly a state actor and therefore a proper party to this § 1983 action, *see Street v. Corrections Corp. of Am.*, 102 F.3d 810 (1996), cannot be held vicariously liable for the actions of its agents, Joseph Spriggs or Sally Remillard, on a respondeat superior basis. *See id.* at 818 (noting that "every circuit to consider the issue has extended the holding [of *Monell* ] to private corporations as well"). Hence, CMS's liability must also be premised on some policy that caused a deprivation of Starcher's Eighth Amendment rights.

■ We turn first to the only remaining individual defendant, Joseph Spriggs.[3] The record reflects that Spriggs knew of Starcher's two previous suicide attempts, and we accept as true for purposes of this appeal that Teresa Cunningham told him that Starcher should be "watched." There is no evidence, however, that Spriggs understood this warning to mean that Starcher might commit suicide. Indeed, Dr. Hamilton's contemporaneously drafted contact notes do not reflect a concern about suicide. Moreover, on at least four occasions between July 10 and August 3, 1995, Spriggs assessed Starcher's condition and determined that he was not suicidal. *Farmer* makes it clear that it was

the estate's burden to present evidence from which a jury could find that Spriggs not only knew of facts from which a substantial risk of serious harm could be inferred, but that he actually drew that inference. *See Farmer*, 511 U.S. at 837. The record shows that Spriggs, after conducting assessments of Starcher's mental condition, repeatedly concluded that he posed no risk of committing suicide. This evidence unequivocally demonstrates that the plaintiff has failed to satisfy the exacting standard of *Farmer* and refutes any suggestion that Spriggs drew the inference that Starcher presented a suicide risk but nonetheless closed his eyes to such a serious medical need. Nor does the informal interaction between Spriggs and Starcher offer support for the proposition that Spriggs' conduct meets the *Farmer* standard. At most, what the plaintiff has shown here is that Spriggs, having been told by Cunningham that Starcher should be watched, may have been negligent in failing to make further inquiry into what Cunningham actually meant by "watch" or in failing to realize that Starcher presented a suicide risk based on the facts giving rise to such an inference. But "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 838. Mere negligence is insufficient to establish an Eighth Amendment claim. *See Woods v. Lecureux*, 110 F.3d 1215, 1222 (6th Cir. 1997). Since Spriggs did not act with deliberate indifference to Starcher's constitutional rights, there is no genuine issue of fact with regard to whether Spriggs violated Starcher's Eighth Amendment rights. Therefore, summary judgment was properly granted to Spriggs in his individual capacity.

---

**3.** The estate voluntarily dismissed Leis and Remillard in their individual capacities.

■ Liability on the part of Hamilton County and CMS could be premised only on actions by Sheriff Leis, Administrator Remillard or Joseph Spriggs pursuant to a policy or policies that caused Starcher's suicide. The estate argues that Hamilton County and CMS should have had a policy requiring that its officers obtain the clinical records from mental health care providers of inmates transferred into HCJC. The estate also contends that the defendants should have had policies regarding blankets and plastic bags in the Medical Unit. The failure of these defendants to have such policies in place, the estate argues, demonstrates deliberate indifference to Starcher's medical needs as an inmate. We conclude that these arguments are foreclosed by this court's en banc decision in *Williams v. Mehra*, 186 F.3d at 685.

In *Williams*, the decedent, Wade, was transferred to the State Prison of Southern Michigan ("SPSM"). *See id.* at 688. Doctors there had reports indicating that Wade suffered from major depression with psychotic features, had repeated thoughts of suicide, and had attempted suicide by hoarding pills. *See id.* In addition, numerous psychological and psychiatric evaluations conducted at SPSM noted that Wade appeared depressed and had some suicidal ideation. See *id.* at 688–89. Approximately three months after arriving at SPSM, Wade killed himself with an overdose of Sinequan tablets that he had hoarded. *See id.* at 689.

Wade's mother sued, claiming that the doctors' practice of using a "pill line"–an arrangement in which each patient in turn receives medication from a nurse and takes it while the nurse watches–instead of dispensing liquid medication constituted deliberate indifference. *See id.* at 692. We held as a matter of law that it did not. *See id.* Although administering medication in liquid form would have been a "small, easy change," we said that "[t]his is not a products-liability case, and the standard is not whether there is something easy that the doctors, with the benefit of hindsight, could have done. It is whether they knew of and disregarded an excessive risk to inmate health or safety." *Id.* (internal quotation marks and alterations omitted).

*Williams* requires us to affirm the district court here. We can find no causal connection between Starcher's death and the defendants' purported lack of a policy requiring that HCJC obtain inmates' medical records. CMS personnel were already aware of Starcher's previous suicide attempts, and whatever other information his records may have contained, none of the contemporaneous psychological evaluations of Starcher revealed that he was a suicide risk. There is no reason to think that if Starcher's records had been reviewed at HCJC, either the county or CMS officials actually would have known that Starcher was a suicide risk. Without that knowledge, their failure to deal with Starcher as a suicide risk could not have been deliberately indifferent under the *Farmer* standard. Hence, the lack of the policy proposed by the estate could not have caused a deprivation of Starcher's constitutional rights under the Eighth Amendment.

Nor can we agree that the defendants were deliberately indifferent in failing to make "a small, easy change" in their policies regarding plastic bags and blankets in the Medical Unit. At bottom, this would require that the defendants treat all inmates in the Medical Unit with the same precautions as utilized with regard to those on suicide watch; i.e., to provide near-constant observation in an area free from all hazardous items. On this score, the estate loses sight of the constitutional right allegedly violated. There is no general right of inmates to be protected

against committing suicide. *See Rich v. City of Mayfield Heights,* 955 F.2d 1092, 1096–97 (6th Cir.1992). Again, the question is not what, in the glare of hindsight, it appears that HCJC and CMS personnel could have done to prevent Starcher from taking his own life. The question, in the context of the policies or lack of policies of the county and CMS, is, "whether they knew of and disregarded an excessive risk to inmate health or safety." *Williams,* 186 F.3d at 692. There is no evidence in this record from which a jury could find that they did. Accordingly, we hold that the district court did not err in granting summary judgment in favor of the defendants.

### IV

We review the other issues raised in this appeal for an abuse of discretion. *See United States v. Mays,* 69 F.3d 116, 121 (6th Cir.1995) (disqualification of counsel); *United States v. Iles,* 906 F.2d 1122, 1130 & n. 8 (6th Cir.1990) (withdrawal of counsel); *Criss v. City of Kent,* 867 F.2d 259, 261 (6th Cir.1988) (denial of further discovery); *In re M. Ibrahim Khan, P.S.C. (Khan v. Yusufji),* 751 F.2d 162, 164 (6th Cir.1984) (recusal).

### A. Disqualification of Cunningham

■ Disciplinary Rule 5–102(A) of Ohio's Code of Professional Responsibility provides: "If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial. . . ." Cunningham was the only individual who could provide evidence that CMS employee Spriggs knew that Starcher's motion had been denied and that a psychologist had warned that Starcher should be watched. Because Spriggs denied having this knowledge, the matter was certain to be contested at trial. It was therefore "obvious" that Cunningham would have to

testify on the estate's behalf. The district court did not abuse its discretion in disqualifying her.

### B. Scheduling of the Litvak Deposition

■ The estate complains that the deposition of Dr. Ronald Litvak was originally scheduled for late December 1996, when the estate was unrepresented. However, when the court vacated the trial date on December 9, 1996, the deposition was canceled and it was never taken. Accordingly, the estate could not have been prejudiced by the scheduling of the Litvak deposition.

### C. Withdrawal of Mansfield

■ Douglas Mansfield testified that he had agreed to do no pre-trial preparation in this case other than to take one or possibly two depositions. He further testified that he could not respond to the defendants' motion for summary judgment "except in the most perfunctory, uninformed, and non-professional manner." In granting Manfield's motion to withdraw, the district court credited this testimony over the contrary assertions of Teresa Cunningham. That decision was well within the discretion of the district court. In any case, the court granted the estate a five month extension after Manfield's withdrawal, during which time the estate obtained new counsel who performed competently. The estate was not prejudiced by Manfield's withdrawal.

### D. Recusal

■ Cunningham moved that the district court judge recuse herself from ruling on the CMS defendants' motion for sanctions. Just as a party has no standing to appeal an order imposing sanctions against his attorney, *see Cabrera v. City of Huntington Park,* 159 F.3d 374, 382 (9th Cir. 1998), so too does Starcher's estate lack standing to challenge Judge Beckwith's re-

fusal to recuse herself from ruling on a motion for sanctions against its attorney. To the extent that the estate is lodging a general accusation of bias against Judge Beckwith, that allegation is not supported by the record. Judge Beckwith credited Mansfield's testimony over that of Cunningham, and invited the defendants to bring a motion for sanctions in the wake of Cunningham's egregious behavior. These actions do not "display a deep-seated favoritism or antagonism that would make fair judgment impossible." *See Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).

### E. Extension of the Expert–Identification Deadline

■ The district court three times extended the deadline by which the estate was to identify and depose a corrections expert. In denying the estate's motion for a fourth extension, the district court found that a further extension would severely prejudice the defendants, and that finding is supported by the record. The district court did not abuse its discretion in declining to grant the motion.

### V

For the foregoing reasons, the judgment of the district court is affirmed.

NATHANIEL R. JONES, Circuit Judge, dissenting.

I agree with the majority that plaintiff Kathy Brown has not put forth sufficient evidence to support a finding that Hamilton County, CMS, Hamilton County Sheriff Simon Leis, or CMS administrator Sally Remillard acted with deliberate indifference to Mr. Starcher's medical needs. However, I disagree with its determination that a reasonable jury could not find that defendant Joseph Spriggs was deliberately indifferent. Accordingly, I respectfully dissent.

It is well settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). While the Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), it does not permit inhumane ones. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In this vein, the Eighth Amendment proscribes "deliberate indifference" to a substantial risk that serious harm would befall an inmate. *See Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Farmer,* 511 U.S. at 834–835; *Street v. Corrections Corp. of America,* 102 F.3d 810, 814 (6th Cir.1996). In *Farmer,* the Supreme Court fleshed out the "deliberate indifference" standard. This standard does not require a claimant to "show that a prison official acted or failed to act believing that harm actually would befall an inmate;" rather an official is deliberately indifferent to an inmate's medical needs when he acts, or fails to act, "despite his knowledge of a substantial risk of serious harm" to the prisoner. *Farmer,* 511 U.S. at 842. In ascertaining whether an official had knowledge of a substantial risk, a claimant can establish such knowledge by "the very fact that the risk was obvious." *Id.* Whether a prison official had the necessary knowledge is a factual question that can be shown "in the usual ways" that claimants prove facts, including inferences from circumstantial evidence. *Id.*

In September 1991, Casey Starcher attempted to commit suicide by hanging himself with an electrical cord. His father discovered him and rushed him to a hospital. Starcher spent five days in a psychiatric unit before being released. Two years later, on September 10, 1993, the

Cincinnati Police Department arrested the then–22–year–old Starcher for receiving stolen property and unlawful firearm possession. While in police custody, Starcher took a police officer's weapon and barricaded himself in a room. The police eventually made their way into the room where Starcher, with the barrel of the gun inside his mouth, threatened to kill himself if they did not stay back. A police negotiator cleverly told Starcher that if he merely sought to kill himself and not hurt anyone else, he could remove the clip from the gun, and use the bullet in the chamber on himself. Starcher complied and reiterated that he would kill himself if the officers did not stay back. As the officers approached him, Starcher pulled the trigger several times, but unbeknownst to him, the gun would not discharge without an engaged clip. The police subsequently subdued Starcher and took the gun away from him.

Pending his trial, Starcher was held at the Hamilton County Justice Center ("HCJC"), which employed Correctional Medical Services, Inc. ("CMS") for the provision of medical and psychiatric service to inmates. At HCJC, Starcher was evaluated by CMS "behavioral science specialist" Joseph Spriggs. Starcher told Spriggs about his suicide attempt in 1991 and his recent suicide attempt in the police precinct. Given that Starcher told Spriggs that he continued to have suicidal thoughts, Spriggs evaluated Starcher as a suicide risk and assigned him to HCJC's Medical Unit. Spriggs continued to meet with Starcher in late 1993 and early 1994 and eventually concluded that Starcher was no longer suicidal, but that he suffered from "situational anxiety," which was precipitated by the status of his legal proceedings. Spriggs Dep at 56.

In November 1993, Dr. Constance Logan, a clinical psychologist at Cincinnati's University Hospital, examined Starcher. While Logan noted that HCJC had not placed Starcher on medication and had removed him from suicide watch, she also noted that the HCJC had determined that Starcher "continue[d] to present a possible suicide risk...." J.A. at 329. Dr. Logan herself concluded that although Starcher "shows no present signs or symptoms of a major mental disorder[,][h]is impulsivity and dislike of incarceration suggest that he continues to represent a risk for self-injurious behavior as a way of demonstrating that dislike." Dr. Logan emphasized that Starcher's problems emanated from his fear of extended incarceration and his need to be accepted by his family and friends. J.A. at 334–35.

On February 23, 1994, Starcher pled guilty to charges of receiving stolen property, unlawful possession, escape, and aggravated robbery and was sentenced to a term of imprisonment. On this same day, after entering his guilty plea, Starcher met with Spriggs and told him that he was extremely disappointed with the performance of his public defender and that he felt as if he had no choice but to accept the prosecutor's plea bargain. Starcher further stated that he desired to be transferred back to the mental health unit, as "suicide could become an option." Spriggs Dep. at 65. Notwithstanding these indications, Spriggs concluded that Starcher was not suicidal and that he should remain in the transitional quarters where he contemporaneously resided.

Shortly after he received his prison sentence, Starcher was transferred to the Warren Correctional Institution ("WCI"), where he became a patient of staff psychologist Dr. Amy Hamilton. Dr. Hamilton determined that Starcher was not suicidal and accordingly concluded that he need not be placed on suicide watch or otherwise segregated from the general inmate population. During this time, Starcher moved the Hamilton County

Court of Common Pleas to withdraw his guilty plea and hoped he would receive a new trial. On May 5, 1995, Starcher received a letter from his attorney that he construed as "bad news" with regard to his pending motion. J.A. at 107–08. Starcher told Hamilton that he could not "do seven more years" in prison, and Hamilton was concerned that Starcher might be suicidal. J.A. at 108–09.

In July, 1995, Starcher was transferred from WCI back to HCJC pending resolution of his plea withdrawal motion. Dr. Hamilton specifically requested that Starcher be placed in HCJC's mental health unit, rather than the general HCJC population, since the former would provide a setting similar to the more serene environment Starcher experienced at WCI. Hamilton indicated that she believed Starcher should be placed in the mental health unit because he needed a "lower stress," "quieter" environment, not because she thought he was suicidal. J.A. at 114–15. Hamilton further testified, however, that such a lower stress environment was necessary, at least in significant part, because Starcher's impending legal matters were likely to be resolved in the near future. Indeed, given her concerns regarding Starcher and his reactions to his legal developments, she called the HCJC to ensure that they were "familiar" with Starcher's situation and specifically asked that Starcher be evaluated as his legal proceedings develop. J.A. at 738; Hamilton Dep at 115–16. Hamilton did not request that Starcher be placed on suicide watch because "he was very hopeful about his legal matters at [that] point so he wasn't suicidal then." J.A. at 739.

Based on Hamilton's admonishment that CMS keep an eye on Starcher, Jean Jones, Spriggs' supervisor at HCJC, asked Spriggs to immediately evaluate Starcher as soon as he was brought to the jail. Since CMS did not have a policy of obtaining outside medical records on inmates housed in the mental health unit, Spriggs did not have—and therefore did not review—Hamilton's evaluations of Starcher's mental well-being over the preceding fourteen months. Spriggs Dep. at 81, 91. Further, at the time of the intake evaluation, Spriggs did not even review his own records detailing his evaluations of Starcher during Starcher's late 1993–early 1994 stay at HCJC. Spriggs Dep. at 84. At intake, Spriggs concluded that Starcher was not suicidal yet, as a "professional courtesy" to Hamilton, assigned him to the Medical Unit—albeit for observation only, as opposed to suicide watch. J.A. at 769–70, 772. Shortly after the intake evaluation, Starcher met with Spriggs and informed him that he was particularly upbeat about his pending appeal. Spriggs subsequently met with Starcher two more times, and although Starcher continued to express serious anxiety with regard to the outcome of his pending motion, Spriggs did not deem this anxiety sufficient to necessitate a suicide watch. J.A. at 770–775.

On August 2, 1995, the Common Pleas court denied Starcher's motion to withdraw his guilty pleas. The next day, Starcher's attorney, Teresa Cunningham, spoke with WCI's Hamilton to inform her that Starcher's motion had been denied and to seek guidance concerning any precautions that should be taken after she told Starcher about the motion's fate. Hamilton told Cunningham that when the latter went to the HCJC to tell Starcher about the court's disposition of his motion, she should "apprise HCJC staff that she will be giving Starcher bad news, and that they use caution in dealing with him." J.A. at 611. Cunningham went to HCJC to relay Hamilton's message. At HCJC, Cunningham spoke with Spriggs and informed him that the court denied Starcher's motion and that Hamilton indicated

that Starcher should be "watched." J.A. at 702–703.[1] Cunningham testified that though Spriggs stated, "Oh, [Starcher] lost the motion. He was counting on that [and] I'll watch him," he did not take any notes, review any files, or make any other indication that he would follow-up on Hamilton's admonition. Cunningham's Dep. at 75–76. CMS had a policy that when inmates housed in the mental health unit received notice of "shocking or bad news," their mental well-being would be re-evaluated. Spriggs Dep. at 109. The record does not indicate that Spriggs took any action after speaking with Cunningham. Sometime after lockdown—either late in the evening of August 3 or early in the morning of August 4—twenty-three year old Starcher committed suicide by placing a plastic bag over his head, securing it with a shoe string or piece of cloth, and suffocating himself.

This court reviews the district court's order granting summary judgment *de novo. See Terry Barr Sales Agency, Inc. v. All–Lock Co. .*, 96 F.3d 174, 178 (6th Cir.1996). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Moreover, the record, and any inferences derived therefrom, "must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Looking at the record in the light most favorable to Brown, and giving her the benefit of all favorable inferences, a reasonable jury could conclude that Spriggs was deliberately indifferent to the possibility Starcher might commit suicide sometime after August 3.[2] As noted above, Spriggs knew of Starcher's previous two suicide attempts, and he knew that Hamilton had specifically alerted his boss Jean Jones—who in turn notified Spriggs—that Starcher should be reevaluated. Additionally, on the day before the suicide, Cunningham specifically told Spriggs that Hamilton indicated that Starcher should be watched "with caution" after he re-

1. In his deposition, Spriggs denied that Cunningham told him about Hamilton's warning. Spriggs contends that Cunningham simply inquired into Starcher's general behavior. For the purposes of deciding the Defendants' summary judgment motion, the district court correctly assumed the validity of Cunningham's testimony.

2. In *Greason v. Kemp*, inmate Greason was placed under the continued supervision of the prison's mental health team given his constant depression and suicidal thoughts. 891 F.2d 829, 832 (11th Cir.1990). After a short meeting with Greason, a prison psychiatrist concluded that Greason's condition had stabilized and that he no longer needed to take anti-depression medication. *Id.* The psychiatrist made this assessment without reviewing Greason's clinical file or assessing his potential for suicide. *Id.* About a month later, after a visit to Greason, Greason's parents in-

formed the prison's mental health team leader that Greason was harboring suicidal thoughts, that he had attempted to commit suicide by tying a cloth around his throat, and that he should be transferred to a hospital given his suicidal behavior. *Id.* at 832–833. The official indicated that he would "take care of it," but in fact did nothing. A few weeks later, Greason killed himself. *Id.* at 833. The Eleventh Circuit reversed a district court's summary judgment for the prison, holding that a reasonable jury could have concluded that, based on what he knew, the team leader's failure to take any steps to prevent Greason's suicide constituted deliberate indifference. *Id.* at 836. *See also Dolihite v. Maughon*, 74 F.3d 1027, 1042–43 (11th Cir.1996) (affirming denial of summary judgment when prison official knew of recent suicide attempt by inmate with a history of mental illness and suicide threats, yet failed to act).

472

ceives notice that his motion was denied. In her deposition, Cunnigham reported that Spriggs acknowledged that he knew Starcher was counting on winning his motion for retrial and indicated that he would watch Starcher. However, despite his knowledge of Starcher's previous suicide attempts and Cunningham's warning, Spriggs did not order that Starcher be watched more closely. In fact, he did not even take any steps to determine the current nature of Starcher's condition. Although CMS's own policy indicated that mentally unstable inmates should be re-assessed when they receive unfortunate news, Spriggs did not make or request such a re-assessment of Starcher, nor does the record indicate that he planned to make such a re-assessment. Given Spriggs' knowledge of Starcher's history, a reasonable jury could certainly find that Spriggs understood that there was a substantial risk that Starcher would commit suicide and that his failure to take any steps to minimize that risk constituted deliberate indifference.