**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 05a0688n.06
Filed: August 10, 2005

**No. 04-1507**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JAMES T. SCHULTZ, Personal Representative of the Estate of James A. Schultz, Deceased, | ) ) ) ) | |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | **ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN** |
| ROBERT SILLMAN, | ) ) | |
| Defendant-Appellant. | ) ) ) | |

Before: COLE and SUTTON, Circuit Judges; BARZILAY, Judge.*

**BARZILAY, Judge**. This action, filed under 42 U.S.C. § 1983, arises from the suicide of James A. Schultz ("Schultz," "the decedent") while he was incarcerated at the State Prison of Southern Michigan ("SMI"), Jackson, Michigan. Plaintiff-Appellee ("Plaintiff") alleged that certain corrections officers violated Schultz's Eighth Amendment right to be free from cruel and

_____

* The Honorable Judith M. Barzilay, Judge of the United States Court of International Trade, sitting by designation.

unusual punishment.  Appellant, Officer Robert Sillman ("Defendant", "Sillman"), and

Defendant Sergeant Probst, another corrections officer at the facility, asserted the defense of

qualified immunity and moved for summary judgment.  The district court dismissed the claims

against Sergeant Probst, but denied summary judgment to Sillman, finding that there was an

issue of material fact as to his liability.  In this appeal, Sillman challenges the district court's

denial of his motion for summary judgment.  As explained below, we affirm the lower court's

denial of summary judgment in this case.

## I. BACKGROUND AND PROCEDURAL HISTORY

In its order of March 23, 2004, the district court fully presented the facts as it discussed

the standards governing review of a motion for summary judgment.  Here, we recite those facts

relevant to the pending appeal.  Schultz committed suicide some time between 2:00 a.m. and

2:18 a.m. on December 17, 2001, while he was held on the base level of SMI's administrative

segregation unit ("Ad. Seg. unit").[1]  On that date, Sillman worked as an officer on duty on the

base level during the third shift, from 10 p.m. to 2 a.m.  As an officer on duty, Sillman was

responsible for making "rounds" every half hour.  JA 337.  Rounds involved approaching each

cell and ensuring that every inmate was present and breathing.  JA 337.  He was also responsible

for making two counts during his shift, which involved a more extensive verification of the

status of inmates housed on the base level.  JA 337.  Sillman testified that it was his duty to

---

[1]Schultz was assigned to Ad. Seg. for "protective segregation" because he had been
threatened by another prisoner.  JA 54, 391.

identify and prevent suicide attempts by the prisoners during his shift, and that he was trained to respond to suicidal gestures. JA 335, 337.

The record contains two versions of what transpired on the night of Schultz's death. Sillman generally testified that Schultz did not exhibit any suicidal behavior. Sillman remembered that during his first round, at 10 p.m., Schultz complained to him about his pain from a recurring kidney problem, and Sillman told him to take his medication. JA 108. Upon eight subsequent rounds, between 10:30 a.m. and 2:00 a.m., Sillman found that Schultz was either lying down quietly or doing something that was not "out of the ordinary." JA 108-111. Sillman did recall hearing a sound of someone kicking a cell door some time before 2:00 a.m. JA 106. The sound came from the south end of the level where Schultz's cell was located. JA 106. Sillman could not remember whether it was Schultz who kicked the cell door. JA 106. When Sillman went to investigate, the kicking ceased. JA 107. At 2:18 a.m. another officer discovered Schultz hanging by a bed sheet from the bars of his cell's window. The record includes a suicide note that was found in the decedent's cell. Schultz wrote that he was taking his life because he could no longer endure the pain caused by his kidney stone. JA 581-584.

Sillman's testimony is contradicted by the testimony of Keith Thompson, an inmate whose cell was two cells away from Schultz's cell on the night in question. Thompson testified that beginning some time between 9 p.m. and 10 p.m., Schultz made repeated complaints about pain, and that the officer on duty, fitting Sillman's description, spoke twice to Schultz. JA 196-198, 205. Schultz made requests to go to the hospital, saying that "he was busting" and that he

needed emergency medical attention. JA 198. Thompson described that Schultz sounded as if he was crying, and that he was "crying for attention." JA 197-198. The officer on duty taunted Schultz, saying something akin to "quit playing . . . – you always are playing. You're not going nowhere tonight," and "you're faking . . . . We're not taking your ass nowhere." JA 203, 205. Schultz was physically agitated, kicking his cell door and yelling, at least till 12:30 a.m., when Thompson fell asleep. JA 206. When Thompson woke up around 2:00 a.m., he heard a commotion as if the officer on duty was "catching up on the rounds." JA 199-200.

As part of its case, Plaintiff presented evidence of Shultz's suicidal tendencies and evidence suggesting that Sillman could have been aware of those tendencies. Schultz had a recorded history of two suicide attempts and a prior incident where he faked suicide in order to obtain medical treatment for his kidney stone. During his first attempted suicide, on July 10, 2001, Schultz hanged himself with a bed sheet while he was incarcerated in the Ad. Seg. unit. JA 146-157. After this attempt, Schultz was held on suicide watch until July 12, 2001, when he was released by a staff psychologist. JA 158-164, 514-521. Schultz again attempted to commit suicide on September 23, 2001. This attempt also occurred while he was housed in the Ad. Seg. unit. Schultz swallowed a handful of pills and required emergency medical attention. After he was treated at a hospital, he was returned to SMI and again placed on suicide watch on the base level of the Ad. Seg. unit, where he stayed till September 27, 2001. JA 165-167, 168-182, 522-523. The prison records establish that while Schultz was on suicide watch, Sillman worked two shifts: one shift as a roving officer on September 23, 2001 and another shift on the first level on

September 26, 2001. JA 184, 188. As a roving officer, he had to provide assistance to all floors of the unit as he was needed. JA 372.

Finally, Schultz's feigned suicide attempt also took place while he was incarcerated in the Ad. Seg. unit and was motivated by his kidney pain. The prison records show that Schultz began complaining about his kidney stone pain on November 28, 2001, the day before the incident, and that he was given emergency treatment. JA 559-561, 564-565. His complaints continued on November 29, 2001, and a sergeant in charge was told by the prison's Health Services to bring Schultz to the emergency room if his pain persisted. JA 562. At that time, Schultz told the sergeant that he had taken 89 pills "in order to die." JA 565. Schultz seemed to have feigned committing suicide in order get prompt medical attention. JA at 563. Schultz was not placed on suicide watch following this incident.

In his testimony, Sillman acknowledged that he heard about Schultz's feigned suicide attempt, specifically that he heard that he "faked taking pills." JA 113. The prison records show that Sillman was working a shift the night Schultz feigned suicide and knew of the incident from others. JA 113, 564. Sillman also admitted that he heard about Schultz's kidney stone complaints. JA 114. Finally, he recalled that Schultz was held in an observation cell at some point in the three months preceding Schultz's death, acknowledging that Schultz may have been on suicide watch. JA 100, 102.

On summary judgment, the district court found that a reasonable jury could conclude that

Defendant Sillman had subjective knowledge of a strong likelihood that Schultz would harm

himself, and that he recklessly disregarded that risk on December 17, 2001. By viewing the

evidence in the light most favorable to the plaintiff, and making all reasonable inferences in his

favor, the district court determined that Sillman (1) knew of the decedent's suicidal tendencies,

(2) knew that those tendencies were provoked by the decedent's painful kidney condition, and

(3) perceived that the decedent presented a substantial suicide risk on the night in question, and

yet disregarded that risk.

## II. DISCUSSION

### A. Appellate Jurisdiction and Qualified Immunity

A district court's denial of qualified immunity is an appealable final decision under 28

U.S.C. § 1291 "to the extent that it turns on an issue of law." *Mitchell v. Forsyth*, 472 U.S. 511,

530 (1985). Under the doctrine of qualified immunity, "government officials performing

discretionary functions generally are shielded from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This

Court evaluates qualified immunity using a tripartite inquiry:

> First, we determine whether the facts viewed in the light most favorable to the
> plaintiff[] show that a constitutional violation has occurred. Second, we
> determine whether the right that was violated was a clearly established right of
> which a reasonable person would have known. Finally, we determine whether the
> plaintiff has alleged sufficient facts, and supported the allegations by sufficient
> evidence, to indicate that what the official allegedly did was objectively

unreasonable in light of the clearly established constitutional right[].

*Toms v. Taft*, 338 F.3d 519, 524 (6th Cir. 2003) (internal citations omitted).

Plaintiff claims that Sillman violated Schultz's Eighth Amendment right by being deliberately indifferent to Schultz's serious medical needs. *Appellee's Br.* at 20-21. In order to sustain a § 1983 claim against an officer for failure to provide medical care, a plaintiff must show that (1) the medical need at issue was objectively "sufficiently serious," and (2) the defendant had subjective knowledge of the serious medical need from which to infer substantial risk of harm to the prisoner and deliberately disregarded that risk. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).

The district court denied Sillman's motion for summary judgment on the qualified immunity defense finding a genuine issue of material fact as to Schultz's Eighth Amendment claim against Sillman. On appeal, Sillman contends that Plaintiff failed to show that Sillman violated Schultz's Eighth Amendment right and challenges some of the district court's inferences from the evidence presented by Plaintiff. While Sillman entangles the legal basis of his appeal with factual disputes about the kind of inferences that the lower court found a reasonable jury could draw from the evidence, Sillman challenges the district court's conclusions that the facts presented by the plaintiff amounted to a violation of the Eighth Amendment right and whether that right was clearly established.

In this appeal, the court does not consider whether Plaintiff's evidence, as construed by

the defendant, is sufficient to present a genuine issue for trial as to Sillman's subjective knowledge. *See Johnson v. Jones*, 515 U.S. 304, 314 (1995) (denials of qualified immunity may not be reviewed on interlocutory appeal insofar as "a defendant simply wants to appeal a district court's determination that the evidence is sufficient to permit a particular finding of fact after trial."). "[R]egardless of the district court's reasons for denying qualified immunity, we may exercise jurisdiction over the . . . appeal to the extent it raises questions of law." *Williams v. Mehra*, 186 F.3d 685, 689-90 (6th Cir. 1999) (en banc) (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996)); *see Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 531 n.3 (6th Cir. 2002) (retaining jurisdiction despite the parties' disagreement on the facts to decide the legal issue of qualified immunity based on the plaintiff's version of the facts). The court's review in this case is limited to the question of whether "all of the conduct which the District Court deemed sufficiently supported for purposes of summary judgment met the *Harlow* standard of 'objective legal reasonableness.'" *Behrens v. Pelletier,* 516 U.S. 299, 313 (1996) (quoting *Harlow*, 457 U.S. at 819 ("The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts.")). Thus we review the purely legal issues of whether, based on the facts interpreted most favorably to the plaintiff, Sillman's conduct constituted, as a matter of law, deliberate indifference to a substantial risk of suicide in violation of the Eighth Amendment right against cruel and unusual punishment and whether that right was clearly established.

**B. The Eighth Amendment Violation**

Plaintiff contends that Sillman violated Schultz's Eighth Amendment rights by being deliberately indifferent to Schultz's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). Deliberate indifference to a prisoner's serious medical needs is established when (1) the medical need is objectively "sufficiently serious"; and (2) the official "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock,* 273 F.3d at 703. The Supreme Court held that the requisite culpability is at least recklessness, which requires a subjective showing that the defendant was aware of the risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).

In order to satisfy the objective component, Plaintiff must allege facts establishing that the medical need at issue was sufficiently serious. *See Estelle*, 429 U.S. at 104. Plaintiff claims that Schultz's suicidal state was a serious medical need that was deliberately disregarded. *See Appellee's Br.* at 22. While recognizing that suicidal tendencies constitute a serious medical need, Sillman instead argues that the objective prong is not met because Schultz only exhibited behavior related to his kidney stone pain – the medical condition that did not correlate with the cause of the decedent's death, the suicide. Sillman thus challenges the plaintiff's theory of liability claiming that the evidence shows that Sillman would have been deliberately indifferent only to Schultz's kidney condition, and that because Schultz's death did not result from the kidney stone, Sillman was not liable. *See Appellant Br.* at 32-33. However, Plaintiff charged

Sillman with ignoring Schultz's behavior of complaining, crying, and other potential suicidal gestures on the night of his death, knowing about Schultz's past suicidal tendencies. *Appellee Br.* at 24-26; *Schultz v. Probst*, No. 02-74088, at 16 (E.D. Mich. Mar. 23, 2004).

It has been well settled in this circuit that an inmate's "psychological needs may constitute serious medical needs, especially when they result in suicidal tendencies." *Comstock*, 273 F.3d at 703 (quoting *Horn v. Madison County Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994)). Although there is no general right to "be screened correctly for suicidal tendencies," once a prison official has been "alerted to a prisoner's serious medical needs," including his psychological needs, the official has an obligation to offer medical care. *Id.* at 702 (denying summary judgment to a prison psychologist who initially had the prisoner under suicide watch but released him the next day when he said he was no longer suicidal, where expert testimony indicated that the psychologist's examination was "grossly substandard." *Id.* at 709).

Under the subjective prong, Plaintiff must prove that the official was deliberately indifferent to the prisoner's serious medical needs. Plaintiff can establish deliberate indifference by showing that the official subjectively perceived facts from which to infer substantial risk of suicide to the prisoner, that he actually drew that inference and then disregarded the risk of harm. *Farmer,* 511 U.S. at 837. Because suicide is a difficult event to predict, this Court inquires "'whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs.'" *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir.

2005) (quoting *Barber v. City of Salem*, 953 F.2d 232, 239-40 (6th Cir. 1992)). Plaintiff need

not prove that Sillman acted "for the very purpose of causing harm or with knowledge that harm

will result," *Farmer*, 511 U.S. at 835, or that he had an "express intent to inflict unnecessary

pain." *Scicluna v. Wells*, 345 F.3d 441, 445 (6th Cir. 2003) (internal citation omitted).

Importantly, a prison official may "not escape liability if the evidence show[s] that he merely

refused to verify underlying facts that he strongly suspected to be true, or declined to confirm

inferences of risk that he strongly suspected to exist." *Farmer*, 511 U.S. at 843 n.8.

While the legal standard for deliberate indifference is a question of law, a finding of

deliberate indifference in a particular case is a mixed question of law and fact. *See Williams*,

186 F.3d at 690. Because the district court found that there is a genuine issue of material fact as

to Sillman's actual knowledge, the court assumes the facts and inferences as Plaintiff alleged

them. The court's task is to review whether, viewing the evidence in the light most favorable to

the plaintiff, the district court's legal determination that Sillman could have acted with deliberate

indifference was correct.

Plaintiff alleges that Sillman ignored Schultz's behavior of crying and other potential

suicidal gestures, while knowing that Schultz had past suicidal tendencies. Plaintiff argues that a

reasonable jury could infer that Sillman knew that Schultz had been on suicide watch based on

the following evidence: (1) Sillman worked two shifts while Schultz was on suicide watch on the

base level of the Ad. Seg. unit – one shift as a roving officer and the other shift as a guard on the

first level; (2) Sillman's testimony recalling that Schultz was held in an observation cell about

three months prior to the night in question, acknowledging that Schultz may have been on

suicide watch. JA 184, 188, 100, 102. Plaintiff also cites Sillman's testimony that he knew that

Schultz feigned a suicide attempt to get medical attention at the end of November 2001, less than

a month prior to Schultz's actual suicide on December 17, 2001. JA 113, 342, 564. Finally,

Plaintiff refers to Sillman's acknowledgment that he knew about Schultz's recurring kidney

stone pain. JA 114. Although Sillman's knowledge about the history of Schultz's suicidal

tendencies may have been incomplete, this evidence pieced together and viewed in the light most

favorable to Plaintiff supports the claim that Sillman possessed knowledge that would put a

reasonable officer on notice that the inmate had suicidal propensities. *Schultz*, No. 02-74088, at

17.

As the district court concluded and we agree, this knowledge coupled with Schultz's

behavior on the night in question suggests that the decedent showed a strong likelihood that he

would take his own life. In order to properly view the evidence in the light most favorable to the

plaintiff, the court must credit inmate Thompson's testimony. Thompson's testimony supports

Plaintiff's claim that on the night of December 17, 2001, during Sillman's shift, Schultz

complained about his kidney pain, made requests to go to the hospital, and "cried for attention."

JA 197-198. While no evidence directly shows that Schultz's behavior was self-injurious,

Thompson's testimony establishes that Schultz was despondent and loudly cried out for

attention. Defendant argues that in order for a corrections officer to be liable under the Eighth

Amendment for deliberate indifference, the officer must have actual knowledge that there is a

strong likelihood of suicide. *Appellant Br.* at 33. Sillman argues that the "substantial risk" that Sillman could have inferred from Schultz's complaints on the night of December 17 was merely the risk that he could suffer complications from his kidney pain and not that he might have killed himself. *Appellant Br.* at 33. But, as the lower court concluded, a reasonable jury could find that Sillman knew that Schultz had exhibited suicidal tendencies "in conjunction with pain associated with his kidney stone." *Schultz*, No. 02-74088, at 20. Such a finding would strengthen the foreseeability of a suicide when the inmate is desperate and agitated because of kidney stone pain.

Despite the inherent unpredictability of human behavior, including suicide, there are physical and verbal gestures that, considering the person exhibiting them in a particular context, objectively indicate suicidal behavior. *See, e.g., Gray*, 399 F.3d at 616. In *Gray*, a pre-trial detainee began talking loudly and destroying items in his holding cell, including the sink, toilet, and phone. 399 F.3d at 614. The detainee was moved temporarily to a "suicide cell" for a day for the sole purpose of preventing further destruction of city property. *Id.* The inmate did not verbally express suicidal intent, but he began having chest pains and the prison officials moved him to a hospital cell. *Id.* at 614-15. After a few hours, the inmate began banging on his cell door and yelling. *Id.* at 615. Different guards at the hospital handcuffed the inmate in order to restrain his agitated behavior. *Id.* Just an hour later, the inmate committed suicide using a hospital gown to hang himself. *Id.* The Court held that the inmate did not demonstrate a "strong likelihood" of committing suicide for the hospital guards to perceive, noting that the only way

that an officer could have concluded that the inmate was a suicide risk was to have the collective knowledge of every other officer about the decedent's suicidal gestures. *Id.* at 616 (affirming the district court's grant of summary judgment in favor of the defendants based on the qualified immunity defense).

Sillman argues that based on *Gray,* he did not have the requisite knowledge that the decedent was suicidal. However, *Gray* is distinguishable from this case because the district court did not impute other officials' knowledge of Schultz' past suicide attempts to Sillman; rather, the district court found that there was evidence in the record that Sillman himself was aware of the past suicide attempts, one of which was feigned. Schultz's repeated complaints, yelling, and kicking of his cell door, if believed, provided sufficient evidence that he was acting in a suicidal manner in light of his prior history.

Sillman also argues that he did not have subjective knowledge of Schultz's risk of suicidal behavior because Sillman thought that Schultz was "faking." As observed by the district court, even Sillman's comments to Schultz that he was "faking" could be interpreted to mean that Sillman, knowing about the decedent's prior fake suicide, believed that Schultz was feigning another attempt, not just physical pain. *Schultz*, No. 02-74088, at 22. Additionally, Sillman's responsibility is not diminished if he declined to investigate the possibility of risk. *See Farmer*, 511 U.S. at 843 n.8. If, as Thompson testified, Schultz repeatedly cried for help, Sillman should have investigated whether Schultz was contemplating suicide. The district court thought it possible that a reasonable jury could determine that Sillman knew of at least one of Schultz's

past suicide attempts, that Sillman suspected that Schultz's medical condition could trigger suicide, and that Sillman ignored Schultz's repeated pleas and cries for help. *Schultz*, No. 02-74088, at 22. In that case, Plaintiff would have demonstrated that Sillman recklessly disregarded a substantial risk that Schultz would commit suicide.[2] While there is no factually apposite precedent in this circuit, the Seventh Circuit has held that a jury is entitled to find deliberate indifference if a prison official, who knew of an inmate's suicidal tendencies, failed to provide aid to that inmate in response to his erratic behavior. *Hall v. Ryan*, 957 F.2d 402, 405 (7th Cir. 1992); *see also Rodgers v. Chapleau,* No. 99-5276, 2000 U.S. App. LEXIS 30209, at \*\*13-14 (6th Cir. Nov. 22, 2000) (unpublished per curiam opinion) (finding a triable issue of fact as to the defendant's liability where the decedent told the defendant guard that he was going to commit suicide and the guard knew about the prisoner's suicidal tendencies).

### C. Whether the Right Was Clearly Established

Once we have established that Plaintiff's version of the facts demonstrates a violation of his constitutional right, the court next decides whether at the time of the suicide, in December

---

[2] Jurors are permitted to consider circumstantial evidence and make inferences in determining whether Sillman had the requisite level of culpability. *See Farmer*, 511 U.S. at 848 (a fact finder is entitled to rely on circumstantial evidence in determining whether the defendant, in an Eighth Amendment case, had the requisite knowledge and that such knowledge can be established "by reliance on any relevant evidence."); *Curry v. Scott*, 249 F.3d 493, 507-08 (6th Cir. 2001) (reversing summary judgment for the defendants, finding that pertinent evidence in the guard's employment record was sufficient for a jury to reasonably infer that the defendants knew about a substantial risk of harm to the inmate from that guard, and that the issue of the defendants' knowledge should be left to the trier of fact.).

2001, a reasonable officer would have known that his conduct was unlawful. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). While this analysis is particularized and fact-specific, the plaintiff does not have to show that the court has had a "fundamentally similar" or "materially similar" case in order for a clearly established right to apply here. *Saucier v. Katz*, 533 U.S. 194, 205 (2001); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). The jurisprudence of the Sixth Circuit has established a clear right of a prisoner not to have his psychological medical needs, in the form of suicidal tendencies, treated with deliberate indifference. *See, e.g., Comstock*, 273 F.3d at 711; *Horn v. Madison County Fiscal Court,* 22 F.3d 653, 660 (6th Cir. 1994); *Danese v. Asman*, 875 F.2d 1239, 1243-44 (6th Cir. 1989). Based on this case law, a reasonable officer would know that recklessly disregarding a known risk of an inmate's suicide would violate the inmate's Eighth Amendment right. Importantly, Sillman does not contest that there is clearly established law that would hold a corrections officer liable for deliberate indifference to the risk of suicide if an inmate demonstrates a strong likelihood that he would commit suicide. Therefore, if a jury determines that Schultz demonstrated a strong likelihood of suicide, and that Sillman was aware of this likelihood but chose to disregard it, Sillman's actions would constitute a violation of Schultz's clearly established Eighth Amendment right to receive medical treatment for his suicidal tendencies.

Accordingly, the denial of the summary judgment entered by the district court is affirmed.