**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0799n.06

No. 09-5714

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Dec 30, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| DUSTIN JERAULD, By and through his Guardian, Patricia S. Robinson on behalf of Patricia S. Robinson, | ) ) ) ) | |
| **Plaintiff-Appellant**, | ) ) | |
| v. | ) ) ) | **ON APPEAL** FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| TERRENCE W. CARL, Jailer of Kenton County, In his Individual Capacity; et al., | ) ) ) ) | |
| **Defendants**, | ) ) | **O P I N I O N** |
| and | ) ) | |
| MARK KROGER, In his Individual Capacity; RAMONA PARKER, Deputy, In her Individual Capacity; PAMELA SAMS, Lieutenant, In Her Individual Capacity, | ) ) ) ) ) } | |
| **Defendants-Appellees**. | ) ) | |

Before: BOGGS, MOORE, and SUTTON, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** Plaintiff-Appellant Dustin Jerauld ("Jerauld"), by and through his mother and guardian, Patricia J. Robinson ("Robinson"), appeals the district court's order granting summary judgment to Defendants-Appellees Mark Kroger ("Kroger"), Ramona Parker ("Parker"), and Pamela Sams ("Sams"). Jerauld's representative filed this lawsuit on Jerauld's behalf under 42 U.S.C. § 1983 following Jerauld's attempted suicide while he was detained at the Kenton County Detention Center ("KCDC"). The lawsuit also involved state-law

claims for negligence, gross negligence, and intentional infliction of emotional distress. The United States District Court for the Eastern District of Kentucky granted summary judgment to Kroger, Parker, and Sams, holding that the defendants were entitled to qualified immunity with respect to the federal claims because Jerauld did not present a strong likelihood of committing suicide, and because these defendants did not display deliberate indifference to Jerauld's medical needs. For the reasons discussed below, we **AFFIRM** the district court's judgment granting summary judgment to Kroger, Parker, and Sams on the grounds of qualified immunity.

## I. BACKGROUND

On February 11, 2004, twenty-one-year-old Jerauld attempted suicide by hanging himself in his cell with his bed linens while in pre-trial custody at KCDC in Covington, Kentucky. He was resuscitated and survived, but remains in a persistent vegetative state.

Jerauld had been arrested on February 7, 2004 and held at KCDC on charges of burglary and drug possession. Jerauld had developed a heroin addiction and had stolen a video game console to sell for money to buy drugs. When Jerauld was arrested, his father asked one of the arresting officers to notify jail personnel that Jerauld had made threats to hurt himself if he went to jail. The arresting officer who transported Jerauld to KCDC told the intake officer at KCDC that Jerauld had threatened to harm himself and that he should be placed on a suicide watch. As part of the booking process at KCDC, Jerauld completed an Inmate Medical Form ("Medical Form") containing twenty-seven questions about his personal history and health, including questions about treatment for mental health or emotional problems, past suicide attempts, and present thoughts of suicide. Jerauld answered "no" to each question screening for suicidal tendencies but indicated that he would probably suffer withdrawal from heroin.

2

Despite Jerauld's negative responses to questions on the Medical Form, Shift Commander Wehrner Stilt ("Stilt") interviewed him privately because of what the arresting officer had relayed about Jerauld's past threats of self-harm. Stilt completed a Psychological Services Referral form ("Psychological Form") eliciting information related to Jerauld's history of suicide, present suicidal thoughts, and other mental health problems. Jerauld answered "no" to all of the questions on the Psychological Form, including questions regarding whether he had previously tried to kill himself or was presently thinking of attempting suicide. Stilt testified that, given the results of these evaluations, prison policy did not indicate a need for further precautions. However, Stilt testified that, because of the possibility that Jerauld would experience heroin withdrawal, he placed Jerauld on a twenty-minute medical watch in an isolation cell.

After his evaluation of Jerauld, Stilt telephoned Mark Kroger, a psychologist under contract with KCDC as its Crisis Intervention Specialist. Kroger was typically contacted by KCDC to treat and assess inmates deemed at risk of suicide. Stilt informed Kroger of the information regarding Jerauld's past threats of self-harm, the answers on the Medical Form and Psychological Form, and the fact that Stilt had placed Jerauld on a medical watch. Kroger testified that, based on the information provided by Stilt, he determined that Jerauld did not need to be placed on a suicide watch.

On February 8, Jerauld made telephone calls to his parents complaining that he was cold, experiencing symptoms of heroin withdrawal, and contemplating suicide. Later that day, he complained to a Certified Medication Aide ("CMA") that he was experiencing heroin-withdrawal symptoms. The CMA provided him with 50 mg of the drug Vistaril, which is used to treat heroin withdrawal. On February 9, Jerauld called his mother and pleaded with her to bail him out of jail.

3

Jerauld also threatened over the phone to hang himself. Later that day, Jerauld asked KCDC nurse and Director of the Medical Unit Pamela Sams to release him from suicide watch. Sams informed him that she did not have the authority to release him but contacted Kroger to evaluate him. Sams reviewed Jerauld's isolation log and spoke with Deputy Kathleen Boyle ("Boyle") who told her that Jerauld had been doing well. Sams testified in her deposition that, at the time, she thought Jerauld was on a suicide-related watch and that Kroger would have been the one to authorize release from such a watch.

When Kroger came to the jail that evening, he interviewed Jerauld for approximately twenty minutes. During the interview, Jerauld denied that he was suicidal or that he had threatened to hurt himself. Jerauld explained that he had said that "he would rather be dead than go to the jail," not because he intended to hurt himself, but because "the jail is . . . just a bad place to go." R. 43 at 15 (Kroger Dep. at 57). Kroger recorded in his notes that Jerauld was able to smile and laugh and that he exhibited no lability (emotional instability). Jerauld told Kroger that he was not experiencing heroin withdrawal symptoms, and Kroger did not observe any such symptoms. Kroger also determined that Jerauld's responses were consistent with his behavior and presentation in the interview, leading Kroger to credit Jerauld's statements that he was not suicidal. After the interview, Kroger approved Jerauld's release to the general population upon the termination of the medical watch. Sams approved Jerauld's transfer to the general population. Sams acknowledged in her deposition testimony that, if Jerauld was on a medical watch, only a physician, not Kroger, would be authorized to release him. However, Jerauld was not evaluated by a medical doctor before the transfer.

4

The following day, on February 10, the CMA on duty gave Jerauld 50 mg of Vistaril to treat his withdrawal symptoms. That afternoon, Jerauld was transferred to a cell in KCDC's general population. That evening, he was provided with a blanket by the watch commander in response to complaints that he was cold. On the morning of February 11, Jerauld was again given Vistaril to treat his withdrawal symptoms. Jerauld also received a visit from his mother at KCDC. Robinson testified that Jerauld looked like he was suffering but that she did not think he required immediate attention. Robinson did not speak to anyone at KCDC about her observations.

Later on February 11, Jerauld told Boyle that he was suffering from withdrawal, was cold, and needed medication. After Boyle told him that medication was given only twice a day, Jerauld became agitated, so Boyle brought Sams to see him in his cell. Boyle recalled that Jerauld was calm during the meeting with Sams. Sams testified that Jerauld complained of being cold but did not exhibit other symptoms of heroin withdrawal, and she determined that Jerauld did not need immediate medical treatment. Sams asked Jerauld if he was going to hurt himself, and he responded that he was not. Sams told Jerauld that a physician would see him the next morning.

At around 7:00 p.m., Jerauld spoke with Deputy Ramona Parker, who was conducting a head count on his floor. Jerauld told her that he needed help, that he was suffering from withdrawal, and stated, "the withdrawals, I can't take it. I need something." R. 49 at 24 (Parker Dep.). Parker assured him that she would have the CMA who was dispensing medication see him first on his floor.

Jerauld telephoned his parents from his cell many times that evening, complaining of withdrawal and threatening to hang himself. Jerauld also requested that his father call KCDC to ask about medicine for his withdrawal symptoms. Jerauld's father called KCDC and spoke with someone who told him that medical personnel were presently dispensing medication. This was the

5

only time that either of Jerauld's parents contacted KCDC about Jerauld's complaints during his detention. Jerauld's parents did not report Jerauld's threats over the phone to anyone at KCDC.

When the CMA arrived on Jerauld's floor, Parker led her directly to Jerauld's cell. When they arrived at approximately 9:25 p.m., Parker and the CMA found Jerauld hanging from his bed sheets. Parker and the other inmates took Jerauld down, and Parker and the CMA began CPR. Jerauld was taken to a hospital, but suffered permanent brain damage and remains in a persistent vegetative state.

On January 6, 2006, Jerauld's mother and guardian filed this lawsuit on Jerauld's behalf, raising federal claims under 42 U.S.C. § 1983, and state claims for negligence, gross negligence, and intentional infliction of emotional distress. On March 19, 2009, the district court granted summary judgment to the defendants, holding that they were entitled to qualified immunity on the federal claims because Jerauld did not present a strong likelihood of committing suicide, and because the defendants did not display deliberate indifference to Jerauld's medical needs. The district court declined to exercise jurisdiction over the state-law claims, which it dismissed without prejudice. On May 18, 2009, the district court denied Jerauld's motion to alter or amend its order. Jerauld filed a timely Notice of Appeal, contesting summary judgment as to Kroger, Parker, and Sams. On appeal, Jerauld challenges the district court's ruling only with respect to the federal claims.

## II. ANALYSIS

### A. Standard of Review

We review de novo a district court's decision granting summary judgment. *Burchett v. Kiefer*, 310 F.3d 937, 941 (6th Cir. 2002). Summary judgment is appropriate if "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED.

6

R. Civ. P. 56(c). "In reviewing a motion for summary judgment, we view all facts and any inferences in the light most favorable to the nonmoving party." *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 390 (6th Cir. 2009); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact." *Perez v. Oakland Cnty.*, 466 F.3d 416, 423 (6th Cir. 2006). This court must "assess the proof to determine whether there is a genuine need for trial." *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 375 (6th Cir. 2002). "The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the plaintiff." *Id.*

**B. Qualified Immunity**

"To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006). Jerauld claims that the defendants violated his due process rights under the Fourteenth Amendment, which applies the protections of the Eighth Amendment to pretrial detainees. The district court granted summary judgment to defendants Kroger, Parker, and Sams based on their qualified immunity from suit.

We assess Jerauld's claim under the framework of qualified immunity under which "'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Burchett*, 310 F.3d at 942 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In order to resolve whether the defendant-officials are entitled to qualified immunity, we must answer two questions. First, "we must determine whether

7

[Jerauld] has alleged facts which, when taken in the light most favorable to [him], show that the defendant-official's conduct violated a constitutionally protected right." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). In addition, "we must . . . determine whether that right was clearly established such that a reasonable official, at the time the act was committed, would have understood that his behavior violated that right." *Id.* We may "exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances." *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 818 (2009).

Addressing the first prong of qualified immunity, Jerauld alleges violations of his constitutional right to adequate medical care as a pretrial detainee. Under the Eighth Amendment, prisoners have a constitutional right to be free from cruel and unusual punishment. "As applied to prisoners, this constitutional guarantee encompasses a right to medical care for serious medical needs, including psychological needs." *Perez*, 466 F.3d at 423. "While the Eighth Amendment does not apply to pre-trial detainees, the Due Process Clause of the Fourteenth Amendment does provide them with a right to adequate medical treatment that is analogous to prisoners' rights under the Eighth Amendment." *Gray v. City of Detroit*, 399 F.3d 612, 615–16 (6th Cir. 2005). The detainee's right is violated "when prison doctors or officials are *deliberately indifferent* to the prisoner's serious medical needs." *Comstock*, 273 F.3d at 702 (emphasis added).

To establish an Eighth Amendment violation, Jerauld must prove "two components, one objective and one subjective." *Id.* The objective component requires Jerauld to allege facts showing that the medical need at issue is "'sufficiently serious.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). A prisoner's "psychological needs may constitute serious medical needs, especially when they result in suicidal tendencies." *Id.* at 703 (internal quotation marks omitted).

8

Because Jerauld alleges that the defendants were indifferent to Jerauld's psychological needs, namely his suicidal tendencies, he satisfies the objective component of his constitutional claim, that his medical needs at issue were "sufficiently serious."

The subjective component requires Jerauld to show deliberate indifference to his suicidal tendencies on the part of the defendants. Jerauld "must allege facts which, if true, would show that" (1) "the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner," (2) "that he did in fact draw the inference," and (3) "that he then disregarded that risk." *Comstock*, 273 F.3d at 703. "Deliberate indifference requires a degree of culpability greater than mere negligence, but less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Perez*, 466 F.3d at 424 (internal quotation marks omitted). "When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Comstock*, 273 F.3d at 703. On the other hand, it is permissible for courts "to infer from circumstantial evidence that a prison official had the requisite knowledge." *Id.* Accordingly, "'deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.'" *Id.* (quoting *Farmer*, 511 U.S. at 836).

We must also consider "whether that [constitutional] right was clearly established" at the time of the violation. *Id.* at 702. "'The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Perez*, 466 F.3d at 427 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

9

"While the right to medical care for serious medical needs does not encompass the right 'to be screened correctly for suicidal tendencies,' we have long held that prison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner." *Comstock*, 273 F.3d at 702. The parties dispute whether Jerauld was under a suicide watch during his time at KCDC, and, therefore, whether Jerauld is in fact asserting a right to accurate screening for suicidal tendencies rather than a right to adequate medical care. However, whether Jerauld was under a suicide or medical watch before he was released into a general population cell does not determine whether the defendants were alerted to Jerauld's serious medical needs and, therefore, whether Jerauld has asserted the violation of a clearly established right. Indeed, we have held that officials may have known of a detainee's suicidal tendencies in cases in which the detainee had been released from suicide watch *See, e.g.*, *Linden v. Washtenaw Cnty.*, 167 F. App'x 410, 425–28 (6th Cir. 2006) (unpublished opinion); *Schultz v. Sillman*, 148 F. App'x 396, 401–04 (6th Cir. 2005) (unpublished opinion).

"This circuit has consistently recognized a prisoner's established right to medical attention once the prisoner's suicidal tendencies are known." *Comstock*, 273 F.3d at 711 (collecting cases). Jerauld claims that the defendants knew of his suicidal tendencies but did not offer adequate care. Therefore, the right at issue in this case is not the right to an accurate diagnosis; rather, the central inquiry is whether the defendants identified Jerauld's suicidal tendencies and were deliberately indifferent to them.

### 1. Mark Kroger

The alleged facts do not show that Kroger "subjectively perceived facts from which to infer substantial risk" to Jerauld, "that he did in fact draw the inference," and "that he then disregarded

that risk." *Id.* at 703. The only alleged fact from which Kroger could have inferred substantial risk of suicide is that someone had relayed to the arresting officer that Jerauld had threatened to harm himself in the past. Stilt testified that, after his screening of and interview with Jerauld, he was not concerned about suicide, but placed Jerauld on a twenty-minute medical watch in an isolation cell as a result of Jerauld's possible heroin withdrawal. The Medical Form and Psychological Form did not indicate suicidal tendencies. Kroger testified that, based on the information conveyed to him by Stilt, he determined that Jerauld did not need to be placed on a suicide watch. Kroger and Stilt testified that prison policies did not require suicide watch or additional precautions under the circumstances.

On the other hand, deposition testimony revealed that the suicide and medical watches could be confused, and that Sams initially was under the impression that Jerauld was under a suicide watch. Interpreting the evidence in the light most favorable to Jerauld, we believe that it is ambiguous which type of watch and procedures were applied to Jerauld. Regardless of the nature of the watch, the key question is whether there are facts from which Kroger could have inferred that Jerauld was at a substantial risk of attempting suicide, and whether Kroger drew this inference.

Although Jerauld's telephone calls to his parents indicated that Jerauld was suicidal, Jerauld does not allege that Kroger was informed of the content of these calls. Indeed, there is no evidence that anyone at KCDC knew about the threats of suicide that Jerauld made in calls to and conversations with his parents during his detention. At no time during Jerauld's detention did Jerauld's father or mother tell anyone at KCDC that Jerauld was making threats to harm himself. To the contrary, Jerauld's parents testified that they did not believe Jerauld's threats of suicide to be

credible. Jerauld's father testified that he thought that Jerauld was making these threats in order to prompt his parents to post his bond so that he could leave KCDC.

In any event, Kroger's notes from the interview with Jerauld and his deposition testimony reveal that he did not conclude that Jerauld presented a substantial risk of attempting suicide. Before Jerauld was released into the general population, Kroger questioned Jerauld in person about his past statements and observed Jerauld's demeanor. Jerauld denied that he had ever threatened suicide. Jerauld explained to Kroger that he had said that he would "rather be dead" than be in the jail because the jail was "just a bad place to go." R. 43 at 15 (Kroger Dep. at 57). When Kroger asked Jerauld if he intended to harm himself, Jerauld said no. Kroger observed that Jerauld's demeanor and body language were consistent with his statements, and concluded that Jerauld did not intend to harm himself. Jerauld does not allege that he presented any warning signs to Kroger in this interview.

Jerauld contends that this case is similar to *Comstock*, in which this court held that the plaintiff alleged facts showing that a prison psychologist who released an inmate from suicide watch had acted with deliberate indifference in light of his "cursory evaluation" of the inmate. *Comstock*, 273 F.3d at 704. But in *Comstock*, factual allegations revealed that the prison psychologist had knowledge of problems between the suicidal inmate and other prisoners. *Id.* at 704–06. The psychologist had ordered that the inmate be placed on suicide watch the day before the suicide in response to the inmate's own expressions of suicidality. *Id.* at 698, 704. The psychologist in *Comstock* further admitted that when he released the inmate from suicide watch, he still suspected that "something was going on" based on his observation of other inmates' behavior and indications from the inmate himself that he was experiencing difficulties with other prisoners. *Id.* at 706.

12

Because of the psychologist's original conclusion that the inmate was suicidal and because of the psychologist's failure to act on his own admitted suspicions with respect to the inmate's true mental state, we held that there was evidence to support a finding that the psychologist was subjectively aware of a substantial risk to the prisoner. *Id.* In contrast, Jerauld alleges no facts showing that Kroger was aware that Jerauld had present intentions to harm himself or that Kroger disregarded his own suspicions of substantial risk.

Even if there were facts from which to conclude that Kroger inferred a substantial risk of suicide, Jerauld does not allege facts showing a disregard of that risk. In *Comstock*, the psychologist released the inmate the day after the inmate personally had reported suicidal feelings to him. *Comstock*, 273 F.3d at 698–99. Moreover, the psychologist suspected that the inmate was not revealing his problems with other inmates. *Id.* at 704–06. In response to this subjective perception of risk, the psychologist failed to review, among other items, the psychological tests administered the previous week and the inmate's medical file which contained a note from a prison physician regarding the inmate's fear of other prisoners. *Id.* at 707. The psychologist also violated the prison's policies with respect to suicide prevention. *Id.* at 709. We observed in *Comstock* that the psychologist would be entitled to qualified immunity if his evaluation had constituted "an inadvertent failure to provide adequate medical care" or a "reasonable response to a known risk to the inmate's health or safety." *Id.* at 707 (internal quotation marks omitted). To the contrary, however, in *Comstock*, "there [was] an abundance of evidence that [the psychologist] did not respond reasonably to the substantial risk of harm, of which he was subjectively aware, to [the inmate's] health and safety." *Id.* at 710.

13

In this case, Jerauld did not express suicidal ideations to Kroger or to any other jail personnel, and in Kroger's judgment, Jerauld credibly explained the statements attributed to him. No one reported to Kroger any further information about Jerauld making statements or exhibiting behavior indicating that he would harm himself after he was brought to the jail. Other cases have held that similar factual allegations did not establish that a prison official was aware of a substantial risk that an inmate would attempt suicide. *See, e.g.*, *Soles v. Ingham Cnty.*, 148 F. App'x 418, 419 (6th Cir. 2005) (unpublished opinion) (holding that defendants were not deliberately indifferent for returning inmate to general population when inmate had not expressed suicidal thoughts for two weeks and when there was "no glaring, new factor" that defendants failed to investigate); *Gray*, 399 F.3d at 616 (concluding that the only way any individual officer would have inferred that the inmate was a suicide risk was to have collective knowledge of every other officer's information regarding the inmate's behavior). In light of these facts, a reasonable factfinder could not conclude that Kroger was deliberately indifferent to Jerauld's suicidal tendencies.

**2. Ramona Parker**

We conclude that Jerauld does not allege facts showing that Parker, a deputy jailer, acted with deliberate indifference when she responded to Jerauld's heroin-withdrawal complaints the night that he committed suicide. The alleged facts show that Parker believed that Jerauld was in need of medical attention, which she obtained, and that Parker acted reasonably under the circumstances. On February 11, Parker was patrolling Jerauld's floor and approached Jerauld in his cell when she was doing a head count. Parker testified that Jerauld asked her for help, stating, "the withdrawals, I can't take it. I need something." R. 49 at 24–25 (Parker Dep.). Parker believed that the CMA could provide medicine to help him deal with the effects of the heroin withdrawal and assured him

14

that she would bring the CMA as soon as possible. Parker testified that, after their discussion, she was cleaning near Jerauld's cell and saw him talking on the phone and "[h]e seemed like he was doing okay." *Id.* at 25. When the CMA came to Jerauld's floor to distribute medications, Parker led her directly to Jerauld's cell, ahead of the other inmates on his floor, as Parker had promised. When Parker and the CMA arrived, they found him hanging in his cell. They took him down with the help of nearby inmates, and administered CPR.

A reasonable factfinder could not conclude from the facts in this case that Parker's behavior in response to Jerauld's complaints amounted to deliberate indifference to a risk of suicide. *See Comstock*, 273 F.3d at 706 ("[Defendant] may . . . prevail if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'"). In contrast, in *Schultz*, an inmate's medical and emotional complaints alerted jail personnel to the existence of a suicide risk, and the officer ignored the inmate's repeated cries for help. *Schultz*, 148 F. App'x at 401–03. In *Schultz*, the officer disregarded the inmate's crying, yelling, kicking of his cell door, and requests to go to the hospital. *Id.* The inmate was suffering from pain due to kidney stones, and the officer was aware of the inmate's previous suicide attempts, including one related to his kidney-stone pain. *Id.* at 402-03. The officer argued that he believed the inmate to be "faking" and failed to provide aid. *Id.* at 403. In light of the officer's knowledge coupled with the inmate's behavior, we concluded that the inmate "showed a strong likelihood that he would take his own life" and that the officer "recklessly disregarded a substantial risk that [the inmate] would commit suicide." *Id.* at 402–03. Parker's

15

conduct did not amount to a similar "reckless[] disregard[]." *Id.* at 403. Jerauld does not allege facts showing that Parker ignored or responded unreasonably to Jerauld's request for help.[1]

### 3. Pamela Sams

We also conclude that Jerauld fails to allege facts showing that Sams was deliberately indifferent to Jerauld's suicidal tendencies. In her deposition, Sams testified that she was aware that Jerauld was a suicide risk and that she believed him to be under a suicide watch. Based on these facts, a trier of fact could conclude that Sams inferred that Jerauld was at substantial risk of attempting suicide. However, Jerauld does not allege facts establishing that Sams disregarded that risk.

On February 9, Jerauld requested that Sams have him released into a general population cell, and Sams responded that it was not her call to make. Although Jerauld should have been referred to a medical doctor if he was on a medical watch, Sams testified that medical watch and suicide watch were frequently confused by jail personnel. Because Sams thought that Jerauld had been deemed a suicide risk, she referred him to prison psychologist Kroger for an evaluation before Jerauld was released to the general population, and released him in accordance with Kroger's evaluation. This was consistent with prison practice for prisoners on suicide watch.

---

[1]In further support of his claim that Parker was aware that Jerauld was suicidal, Jerauld alleges that Parker also observed Jerauld in his isolation cell on February 9 based on entries in the observation log. Jerauld alleges that these entries show that Parker should have been on notice that Jerauld was a suicide risk. The entry corresponding to Parker noted that Jerauld was sitting quietly, standing, or sleeping when she observed him. Even if Parker identified Jerauld as the same inmate she had observed on February 9, and even if Parker would have thought Jerauld on a suicide rather than medical watch at that time, Jerauld does not allege facts showing that Parker's actions could constitute deliberate indifference.

16

Sams visited Jerauld, monitored his condition, and released him to the general population after referring him for a psychological evaluation.[2] *Compare Linden*, 167 F. App'x at 418–19 (holding that social worker did not act with deliberate indifference when she visited inmate during his incarceration, monitored his condition, and released him from suicide precautions in accordance with advice of the prison psychiatrist who evaluated the inmate) *with Perez*, 466 F.3d at 424–26 (holding that genuine issue of fact remained when caseworker—who had herself placed the inmate on elevated watch several times in response to his threats of suicide—assigned inmate to a single cell without consulting a prison psychiatrist). "Simply because [an official] may have been able to avert [an inmate's] suicide by making a different decision—one that would have contravened the advice of a more learned expert—does not give rise to culpability under the Eighth Amendment." *Linden*, 167 F. App'x at 418. Under the alleged facts, Sams did not exhibit deliberate indifference to Jerauld's psychological needs.

### III.  CONCLUSION

Jerauld does not allege facts from which a reasonable factfinder could conclude that Kroger, Parker, or Sams acted with deliberate indifference to Jerauld's suicidal tendencies. Therefore, we **AFFIRM** the district court's judgment granting summary judgment to Kroger, Parker, and Sams on the grounds of qualified immunity.

---

[2]On February 9, Sams asked Jerauld if he was experiencing withdrawal or emotional problems, to which he responded that he was not. She also reviewed his isolation log, and spoke to a deputy who had monitored him. Sams then called Kroger, who evaluated Jerauld before he was released. Sams was also in contact with Jerauld on February 11, the day that he attempted suicide, after he had been released to the general population. When Boyle brought Sams to see Jerauld, Jerauld was calm and did not appear to be in distress. Sams testified that Jerauld complained of being cold but did not exhibit other symptoms of heroin withdrawal, and she determined that he did not need immediate medical treatment. Sams asked him if he was thinking of hurting himself, and he replied that he was not.