RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0032p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────────

JERRY LAWLER, as father, next friend, and personal representative/administrator of the estate of Brian Christopher Lawler, Deceased,

*Plaintiff-Appellee*,

*v.*

HARDEMAN COUNTY, TENNESSEE,

*Defendant*,

ELLEN FUTRELL; WILLIAM GONZALEZ; JUDY WIGGINS,

*Defendants-Appellants*.

No. 22-5898

─────────────────────

Appeal from the United States District Court for the Western District of Tennessee at Jackson.
No. 1:19-cv-01174—S. Thomas Anderson, District Judge.

Argued:  August 3, 2023

Decided and Filed:  February 16, 2024

Before:  GIBBONS, LARSEN, and MURPHY, Circuit Judges.

─────────────────────

## COUNSEL

**ARGUED:**  Nathan D. Tilly, PENTECOST, GLENN & TILLY, PLLC, Jackson, Tennessee, for Appellants.  Matthew T. May, ROSENBLUM & REISMAN, P.C., Memphis, Tennessee, for Appellee.  **ON BRIEF:**  Nathan D. Tilly, PENTECOST, GLENN & TILLY, PLLC, Jackson, Tennessee, for Appellants.  Matthew T. May, Jeffrey S. Rosenblum, ROSENBLUM & REISMAN, P.C., Memphis, Tennessee, for Appellee.

—————————

**OPINION**

—————————

MURPHY, Circuit Judge.  The doctrine of qualified immunity insulates public officials from liability under 42 U.S.C. § 1983 unless the caselaw existing *at the time of their actions* clearly established that they violated the Constitution.  There often will not be much difference between the then-existing law and the current law.  As this case shows, however, this distinction can sometimes matter.

In July 2018, Brian Lawler tragically committed suicide at a county jail.  To hold officers liable for failing to prevent a pretrial detainee's death at that time, our caselaw required proof that the officers *subjectively believed* that there was a strong likelihood the inmate would commit suicide.  *See Grabow v. County of Macomb*, 580 F. App'x 300, 307–09 (6th Cir. 2014).  Today, however, our court would hold officers liable if they *recklessly overlooked* a pretrial detainee's strong likelihood of suicide—even if they did not subjectively recognize it.  *See Helphenstine v. Lewis County*, 60 F.4th 305, 316–17 (6th Cir. 2023).  When denying qualified immunity to the officers sued in this case, the district court held that a reasonable jury could find that they "recklessly disregarded" the strong risk that Lawler would commit suicide.  But that standard governs today; it did not govern when Lawler committed suicide in 2018.  And when we apply the correct test, the evidence shows that the officers did not subjectively believe that Lawler was likely to take his life.  We thus reverse the district court's denial of qualified immunity to the officers.

I

Brian Lawler spent many years in the wrestling business.  He wrestled both with World Wrestling Entertainment and with other independent companies.  But he eventually landed on hard times after suffering injuries and struggling with addictions.

Around 1:00 a.m. on July 7, 2018, a sheriff's deputy stopped Lawler for traffic infractions in Hardeman County, Tennessee.  Lawler was driving on a suspended license, and the

deputy suspected that he was impaired.  The deputy thus arrested Lawler and took him to the Hardeman County Jail.

Later that morning, Sergeant Ellen Futrell booked Lawler into the county jail.  Jail policies required her to complete a medical-screening form.  Futrell completed this form by asking Lawler questions and recording his answers on her computer.  During this screening, Lawler stated that he suffered from bipolar disorder and that he had been prescribed medication for this condition.  He also disclosed that he was taking oxycodone and Xanax and had experienced withdrawals in the past from his drug and alcohol abuse.  He added that he had once suffered a head injury that required hospitalization.

The screening form separately evaluates an inmate's suicide risk.  One compound question asks: "Have you attempted suicide in the past?  If yes, how long ago?  If 2 Yrs or less call crisis."  Form, R.90-7, PageID 1345.  In response to this inquiry, Lawler admitted that he had attempted suicide.  Futrell thus originally typed "Yes" in response to the question, which led the jail's computer system to automatically place Lawler on suicide watch.  But Futrell soon learned that Lawler's attempt had occurred more than two years ago.  According to Futrell, Lawler (who was 46 years old) said that he had attempted suicide "in his 20s, when he was young and experimenting."  Futrell Dep., R.92-6, PageID 2200.  She thus changed the answer to "No" in the computer system, which took Lawler off suicide watch.  The form's next question then directed Futrell to ask: "Are you currently thinking about suicide?"  Form, R.90-7, PageID 1345.  Lawler answered "No."  *Id.*  Ultimately, Futrell chose not to record Lawler's prior suicide attempt anywhere on the form because he did not appear suicidal.

Two days later, Nurse Jill Shearon evaluated Lawler.  Lawler again disavowed any desire to harm himself.  And Shearon also concluded that he was not suicidal.

Unable to post bond, Lawler remained in jail for weeks.  Near the start of his detention, he told jail staff that he had fallen out of his cell's top bunk and injured his knees.  Nurse Shearon gave him ibuprofen in response to this incident and on a few other occasions.  But Lawler repeatedly complained that jail staff often failed to provide him with his daily over-the-counter medications to manage his chronic knee pain.

On Saturday, July 28, Lawler got into a fight with another inmate. He suffered a substantial cut that started on his forehead above his left eye and ran down past the inside of his eyebrow. Lawler demanded to go to the hospital. The record contains conflicting evidence about his reason. Some evidence suggests that he claimed to have a concussion. Other evidence suggests that he claimed to need plastic surgery to prevent a scar.

Nurse Shearon did not work on the weekends. Officer Judy Wiggins called her about Lawler's cut around 11:00 a.m., suggesting that he "may need stitches." Shearon Dep., R.92-11, PageID 2722. Shearon asked Wiggins to text her a picture of the injury. After reviewing the photo, Shearon did not believe it looked all that bad. She instructed Wiggins to clean and bandage the wound. Yet Lawler refused to accept care from Wiggins.

As a result, Shearon made a special trip to the jail shortly before noon to treat Lawler. After confirming that he did not need to go to the hospital, she cleaned the cut and put butterfly closures on it. Still, she did not want Lawler returned to the jail's "general population" until Monday. Shearon Dep., R.92-11, PageID 2692. She instructed Wiggins to place him in an intake cell so that the officers could "watch him closer because of the laceration." *Id.* Shearon, though, did not identify any specific intake cell. She then left.

Wiggins placed Lawler in Cell 90 around noon. To walk to that cell, one had to get buzzed through a secure door into the sally port and turn to the right. The sally port otherwise led straight back to another secure door that opened into a large garage for vehicles. Cell 90's door had a vertically long but narrow window. Given the cell's isolated location and narrow window, staff members could not see Lawler from the intake area's central desk unless he stood in front of the door. According to Wiggins, she had to put Lawler in this "cell of last resort" because they were holding juveniles in other intake cells. Wiggins Dep., R.92-16, PageID 3129–30.

Lawler disliked Cell 90. He "ranted and raved" over the next six and a half hours. *Id.*, PageID 3099. Lawler yelled that he wanted to go to the hospital or back to his pod. He also asked Wiggins to call his father so that he could try to obtain bail money. And he repeatedly kicked and hit his cell door. According to Wiggins, Lawler's temperamental nature represented

a "drastic change" from his mood during her prior interactions with him. *Id.*, PageID 3141, 3189. Despite his loud and repeated outbursts, Wiggins did not alert Nurse Shearon or anyone else about his conduct. Nor did she try to calm Lawler or meet his demands.

That evening, some correctional officers made a taco dinner near the end of their shift. Around 6:30 p.m., Officer William Gonzalez volunteered to clean up the mess and take out the trash. To get to the outside dumpster, Gonzalez needed to walk through the sally port and garage. He decided to look in on Lawler while passing Cell 90. Gonzalez viewed that task as part of his duties even if it did not correspond with an officially scheduled "check." He also liked to "interact with" Lawler, a well-known wrestler. Gonzalez Dep., R.92-37, PageID 4413. Lawler had always been "upbeat" and "happy" during their interactions. *Id.*, PageID 4377, 4418, 4421.

Gonzalez thus peered into Cell 90 as he walked to the dumpster. The cell contained a concrete bench that, from Gonzalez's perspective at the narrow window, ran across its left wall. Made of cinder blocks, this bench rose about two feet from the floor. Lawler appeared to be standing on the corner of the bench to the left of the cell door with his back against the front wall. Gonzalez could not see Lawler's face because he had a towel draped over his head and neck. When Gonzalez knocked, Lawler did not move.

Rather than wait for a reaction, Gonzalez finished taking the trash out through the garage. According to Gonzalez, inmates "commonly" stood on the corner of the bench closest to the cell door to hide from onlookers. *Id.*, PageID 4447, 4462–63. Gonzalez also knew that inmates regularly put towels around their necks or heads (although he had not seen Lawler do so before). And inmates often did not answer when staff knocked on their cell doors. So Gonzalez thought that an "upset" Lawler was simply trying to hide from passersby because he was "famous" and had a cut on his face. *Id.*, PageID 4408, 4413, 4438.

Gonzalez took the trash out and returned to Cell 90 about one minute later. Lawler was in the same position. Gonzalez knocked again, but Lawler again did not respond. So Gonzalez knocked a third time more loudly. When Lawler still did not respond, Gonzalez called out to Wiggins (who was at the intake desk): "Miss Judy, come out here. I think we need to go in this

cell."    Wiggins Dep., R.92-16, PageID 3209.    An inmate in a neighboring cell allegedly overheard Gonzalez tell Wiggins that Lawler was not "moving or nothing."  Jones Dep., R.92-5, PageID 2124.

Wiggins replied that she had just checked on Lawler.  No more than 10 to 15 minutes had passed between when she had seen Lawler alive and when they entered his cell.  According to the neighboring inmate, Wiggins also said that Lawler was "probably faking" because "[h]e's a good actor[.]"  *Id.*, PageID 2124–25.  The inmate opined that "[m]aybe three to four" minutes went by between when he heard this comment and when he heard the officers in the cell.  *Id.*, PageID 2126.

Wiggins alerted staff to open the cell door as she walked to the cell.  Once inside, the officers realized that Lawler had hanged himself.  Except for those on suicide watch, inmates may keep their own shoes.  Lawler had used the shoestrings from his New Balance gym shoes to fashion a makeshift noose.  He had gotten up on the bench and tied the shoestrings to a large bolt protruding an inch or so out of the top of the cell's front wall to the left of the cell door.  Lawler had then wrapped the shoestrings around his neck.  The shoestrings were holding his weight, and his feet were to the side of (but level with) the concrete bench.  With his back against the front wall, Lawler faced the back of his cell.  And he still had the towel over his head.

Wiggins screamed for another officer to bring scissors so that they could cut the shoestrings.  In the meantime, she tried to hold Lawler up by his legs to relieve the pressure on his neck.  After receiving the scissors from another officer, Gonzalez quickly cut the shoestrings.  Lawler and Wiggins tumbled to the floor because she could not hold his full weight.  The officers laid him on his back, began CPR, and called for an ambulance.  EMTs took Lawler to the hospital, but he died the next day.

As a result of Lawler's suicide, his father brought several claims under 42 U.S.C. § 1983 against Futrell, Wiggins, Gonzalez, Sheriff John Doolen, and Jail Administrator Leonard Brown.  Lawler's father alleged that these officials had acted with deliberate indifference to the risk that Lawler would commit suicide.  Lawler's father also brought a claim against Hardeman County under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  He alleged that the county

had followed an unconstitutional policy of inadequately training its officers on suicide prevention.

After discovery, the defendants moved for summary judgment. The district court granted their motion in part and denied it in part. *See Lawler v. Hardeman County*, 2022 WL 4587171, at \*5–9 (W.D. Tenn. Sept. 29, 2022). As relevant now, the court denied qualified immunity to Officers Futrell, Wiggins, and Gonzalez. *Id.* at \*4–6. At the outset, it recognized the then-existing uncertainty in our caselaw over the standards that a plaintiff must meet to prove a deliberate-indifference claim in the context of pretrial detainees like Lawler. *Id.* at \*4–5. The court selected a legal test that asked whether an officer "recklessly" overlooked that an inmate faced a risk of harm—not one that asked whether the officer "subjectively knew" of this risk. *Id.* at \*5–6.

Applying this test, the court held that a reasonable jury could find that Officers Futrell, Wiggins, and Gonzalez were deliberately indifferent to the risk that Lawler would commit suicide. *Id.* The court concluded that a jury could find that Futrell "recklessly disregarded" Lawler's "risk factors for suicide" by failing to disclose his prior attempt on the medical-screening form. *Id.* It next held that a jury could find that Wiggins "recklessly disregarded" the "strong likelihood" that Lawler would commit suicide. *Id.* at \*6. She ignored his volatile behavior throughout the day, and she allegedly said that Lawler was "probably faking" and did not open his cell door for "three to four minutes" after Gonzalez raised concerns. *Id.* And the court held that a jury could find that Gonzalez "recklessly disregarded" the "strong risk" that Lawler was committing suicide when Gonzalez took out the trash after he thought he saw Lawler standing on the bench in the corner of his cell with a towel draped over his head. *Id.*

The district court issued a mixed ruling on the remaining claims. The court granted qualified immunity to Sheriff Doolen and Administrator Brown. *Id.* at \*4, \*6–7. But it held that a reasonable jury could find that Hardeman County had followed an unconstitutional policy of failing to properly train its officers on preventing inmate suicides. *Id.* at \*8–9.

Officers Futrell, Wiggins, and Gonzalez (collectively, the "Officers") have immediately appealed the district court's denial of qualified immunity under the collateral-order doctrine.

*See DeCrane v. Eckart*, 12 F.4th 586, 601 (6th Cir. 2021). We review the court's decision de novo, resolving all genuine factual disputes in the light most favorable to Lawler's father. *See Gambrel v. Knox County*, 25 F.4th 391, 399, 404 (6th Cir. 2022).

II

To overcome the Officers' qualified-immunity defense, Lawler's father must establish two things. *See id.* at 399. He first must prove that the Officers violated the Constitution. He then must prove that the governing caselaw "clearly established" the violation. *See District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018); *Beck v. Hamblen County*, 969 F.3d 592, 598 (6th Cir. 2020). We may address these two requirements in the order that best suits the case. *See Beck*, 969 F.3d at 598–99 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Here, given that the controlling legal rules have recently changed, we find it easiest to resolve the Officers' appeal by jumping immediately to the "clearly established" requirement. We need not (and do not) decide whether the Officers violated today's legal rules because Lawler's father has not shown that they violated the rules in place when Lawler committed suicide. Qualified immunity thus insulates the Officers from this damages suit.

A

1

Because the district court invoked the wrong set of legal rules (understandably so, given our evolving caselaw), we begin by clarifying the law that applies here. Qualified immunity shields public officials from the time and expense of a trial unless their actions infringed "clearly established" rules that a "reasonable person" would have understood. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam) (quoting *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (per curiam)). This immunity seeks to give officials "fair notice" about when their actions will subject them to liability. *Id.*; *see Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam). And officers will obviously lack notice of future rules that a court has yet to adopt. So courts evaluating a qualified-immunity defense may consider only the legal rules existing when "the challenged conduct" occurred, not legal rules adopted by later caselaw. *Ashcroft v. al-*

*Kidd*, 563 U.S. 731, 741 (2011); *see Kenjoh Outdoor, LLC v. Marchbanks*, 23 F.4th 686, 694 (6th Cir. 2022); *Hansen v. Aper*, 746 F. App'x 511, 517 n.3 (6th Cir. 2018).

Under this framework, we must identify the rules that governed in July 2018 when Lawler took his life. This inquiry starts by identifying the constitutional right at issue. Lawler was a pretrial detainee at the time of his death, meaning that a court had yet to try or punish him. Lawler's father thus cannot invoke the Eighth Amendment right against "cruel and unusual punishments" because that right kicks in only after a conviction. U.S. Const. amend. VIII; *see Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). Still, pretrial detainees like Lawler do have a Fourteenth Amendment right not to be "deprive[d]" of their "life" "without due process of law." U.S. Const. amend. XIV, § 1. And the Supreme Court has long held that the Due Process Clause offers protections to pretrial detainees that at least match those afforded convicted prisoners under the Eighth Amendment. *See County of Sacramento v. Lewis*, 523 U.S. 833, 849–50 (1998).

Having identified the right, we next must identify the claim at issue. This case implicates the legal rules that apply to claims that jail staff violated the Due Process Clause by failing to protect pretrial detainees from harm. These types of claims can arise in a variety of circumstances. Sometimes, a correctional officer might fail to protect the detainee from violence by other inmates. *Cf. Farmer v. Brennan*, 511 U.S. 825, 830 (1994). Other times, a prison doctor might fail to treat the detainee for a harmful medical condition. *Cf. Estelle v. Gamble*, 429 U.S. 97, 102–06 (1976). At still other times, jail staff might fail to thwart a detainee's suicide. *Cf. Downard ex rel. Downard v. Martin*, 968 F.3d 594, 598–99 (6th Cir. 2020).

In the Eighth Amendment context, the Supreme Court has held that the failure to protect prisoners from harm violates the ban on cruel and unusual punishment only if the prisoners prove both objective and subjective elements. *See Farmer*, 511 U.S. at 834. Objectively, prisoners must have faced a "substantial risk of serious harm." *Id.* Subjectively, officers must have acted with "deliberate indifference" to this risk. *Id.* Under this test, an inmate must prove both that an officer subjectively knew of facts that created a substantial risk of serious harm to the inmate and that the officer subjectively concluded that this risk existed. *Id.* at 837. Because officers must

consciously *know* of the risk, then, they do not violate the Eighth Amendment merely by negligently or recklessly overlooking it. *Id.* at 837–38.

Should these Eighth Amendment rules for failure-to-protect claims by prisoners extend to similar claims by pretrial detainees under the Due Process Clause? For years, we answered "yes" to this question. *See Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018); *Richko v. Wayne County*, 819 F.3d 907, 915 (6th Cir. 2016); *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001); *Barber v. City of Salem*, 953 F.2d 232, 235 (6th Cir. 1992).

But the ground underlying our traditional approach began to shift in 2015 when the Supreme Court decided *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). That case concerned an excessive-force claim (not a failure-to-protect claim). *See id.* at 392–93. In the Eighth Amendment context, excessive-force claims also have objective and subjective components. *See Johnson v. Sootsman*, 79 F.4th 608, 615–16 (6th Cir. 2023). But the subjective element demands more than deliberate indifference. A correctional officer's use of force against a prisoner violates the Eighth Amendment only if the officer acted "maliciously and sadistically to cause harm." *Id.* at 616 (quoting *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam)). In *Kingsley*, the Court refused to extend this demanding Eighth Amendment test to a pretrial detainee's excessive-force claim. 576 U.S. at 400–02. The Court instead held that the Due Process Clause required pretrial detainees to show only that the force "was objectively unreasonable." *Id.* at 397.

In the ensuing years, circuit courts disagreed over whether *Kingsley*'s decision to jettison the Eighth Amendment's subjective element for a pretrial detainee's excessive-force claim also modified the subjective element for a pretrial detainee's failure-to-protect claim. *See Beck*, 969 F.3d at 601. In 2021, we sided with the courts that extended *Kingsley* to this failure-to-protect context. *See Brawner v. Scott County*, 14 F.4th 585, 591–97 (6th Cir. 2021). After initial disagreement over what *Brawner* required, we settled on a test that reduced *Farmer*'s subjective element from "actual knowledge to recklessness." *Helphenstine v. Lewis County*, 60 F.4th 305, 316 (6th Cir. 2023); *cf. Trozzi v. Lake County*, 29 F.4th 745, 757–58 (6th Cir. 2022). Today, officers can face liability even if they did not *actually know* of a risk of harm to a pretrial

detainee.  Pretrial detainees need only prove that the officers *recklessly disregarded* a risk so obvious that they either knew or should have known of it.  *See Helphenstine*, 60 F.4th at 317.

What do these recent legal changes mean for the claims here?  The changes do not affect our resolution because Lawler's father must overcome qualified immunity's "clearly established" prong.  Our recent cases that depart from *Farmer* in this pretrial-detainee context came out between 2021 and 2023.  Because they postdate Lawler's suicide, they do not clearly establish anything "at the time" the Officers acted.  *Kenjoh Outdoor*, 23 F.4th at 694.  Admittedly, the Supreme Court decided *Kingsley* before Lawler took his life.  But *Kingsley*, a decision about excessive force, did not clearly apply to this failure-to-protect context.  The circuit split about *Kingsley*'s scope confirms this point.  *See Beck*, 969 F.3d at 601.  In short, our older decisions applying *Farmer* to the claims of pretrial detainees provide the only clearly established law in 2018.

This difference matters.  To be sure, the district court suggested that it need not decide whether *Brawner* modified *Farmer* because Lawler's father had created a genuine dispute of fact even under *Farmer*'s more demanding test.  *See Lawler*, 2022 WL 4587171, at *4–5.  But the court actually invoked *Brawner*'s more lenient test in all but name when applying the law to the facts.  It reasoned that a jury could find that the Officers had "*recklessly* disregarded" a significant risk that Lawler would take his life.  *Id.* at *5–6 (emphasis added).  *Farmer*, however, requires the Officers to have "*consciously*" (not recklessly) disregarded that risk.  511 U.S. at 839 (emphasis added).  That is, they must have "draw[n] the inference" that the risk existed.  *Id.* at 837.  The district court thus applied the wrong law to deny the Officers qualified immunity.

2

Given the date of the conduct at issue, we instead must apply *Farmer*'s standards.

*Objective Element.*  *Farmer*'s objective element generally requires inmates to show that they faced a "substantial risk of serious harm" before they suffered an injury.  511 U.S. at 834.  When this substantial risk of serious harm arises from a physical or mental impairment, the Court has added that "serious medical needs" can satisfy this objective element.  *Estelle*, 429 U.S. at 104; *see Phillips v. Tangilag*, 14 F.4th 524, 534 (6th Cir. 2021).

Adapting these standards to the suicide context, our cases have held that death by suicide amounts to a serious harm—indeed, the most serious of harms. *See Barber*, 953 F.2d at 239–40. Yet what facts create a "substantial risk" that inmates will suffer this harm? *Farmer*, 511 U.S. at 834. We have repeatedly stated that the estates of deceased inmates can satisfy this element by showing that the inmates suffered from "psychological needs" that led them to have "suicidal tendencies." *Horn v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994); *see, e.g.*, *Baker-Schneider v. Napoleon*, 769 F. App'x 189, 192 (6th Cir. 2019); *Nallani v. Wayne County*, 665 F. App'x 498, 507 (6th Cir. 2016); *Broughton v. Premier Health Care Servs.*, 656 F. App'x 54, 56 (6th Cir. 2016); *Bonner-Turner v. City of Ecorse*, 627 F. App'x 400, 407–08 (6th Cir. 2015); *Jerauld ex rel. Robinson v. Carl*, 405 F. App'x 970, 975 (6th Cir. 2010); *Cooper v. County of Washtenaw*, 222 F. App'x 459, 465 (6th Cir. 2007); *Linden v. Washtenaw County*, 167 F. App'x 410, 416 (6th Cir. 2006); *Comstock v. McCrary*, 273 F.3d 693, 703–04 (6th Cir. 2001).

At the same time, we have yet to clarify what we mean by "suicidal tendencies" or what types of words or actions qualify. Some cases suggest that an inmate's pre-suicide statements and conduct must reveal an objectively "strong likelihood" that the inmate would try to commit suicide. *Perez v. Oakland County*, 466 F.3d 416, 428–29 (6th Cir. 2006); *see Troutman v. Louisville Metro Dep't of Corrs.*, 979 F.3d 472, 482–83 (6th Cir. 2020); *Mantell v. Health Prof'ls Ltd.*, 612 F. App'x 302, 306 (6th Cir. 2015); *Grabow v. County of Macomb*, 580 F. App'x 300, 307 (6th Cir. 2014); *Galloway v. Anuszkiewicz*, 518 F. App'x 330, 333 (6th Cir. 2013); *Davis v. Fentress County*, 6 F. App'x 243, 249 (6th Cir. 2001). These cases have looked to such objective factors as whether inmates recently attempted suicide, *see Troutman*, 979 F.3d at 484, or whether they threatened to harm themselves, *see Davis*, 6 F. App'x at 247, 249. But other cases suggest that the estates of deceased inmates can "easily" meet the objective element— essentially on the ground that the suicide itself revealed the inmates' suicidal tendencies. *Comstock*, 273 F.3d at 703–04. Officers in some of our cases thus have not even disputed this element. *See Baker-Schneider*, 769 F. App'x at 192; *Nallani*, 665 F. App'x at 507; *Broughton*, 656 F. App'x at 56.

*Subjective Element*. Most of our cases addressing inmate suicides instead turn on *Farmer*'s subjective element. This element requires an inmate to prove that an officer knew of

the facts creating the substantial risk of serious harm. *Farmer*, 511 U.S. at 837. As noted, moreover, the inmate must also prove that the officer believed that this substantial risk existed. *Id.* And even if an officer knows of the substantial risk, the inmate must lastly show that the officer "responded" to the risk in an unreasonable way. *Id.* at 844; *see Beck*, 969 F.3d at 601–02.

This framework creates a "demanding" test when an estate of a deceased inmate challenges an officer's failure to prevent a suicide. *Galloway*, 518 F. App'x at 335. After all, inmates often take their lives "without warning," so jail staff will find it "difficult" to identify the inmates who pose substantial suicide risks. *Andrews v. Wayne County*, 957 F.3d 714, 717 (6th Cir. 2020) (quoting *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005)). To account for this unpredictability, we have held that an estate must prove more than that an officer knew of a "*possibility*" or "even a *likelihood*" of the suicide. *Downard*, 968 F.3d at 601 (quoting *Galloway*, 518 F. App'x at 336). Rather, the officer must have believed that a "strong likelihood" existed that the inmate would commit suicide. *Barber*, 953 F.2d at 240; *see Downard*, 968 F.3d at 601.

How can an estate make this showing? Because the question concerns an officer's state of mind, an estate can prove this factual issue "in the usual ways" that plaintiffs try to show a defendant's mindset in other contexts—with either direct or circumstantial evidence. *Farmer*, 511 U.S. at 842; *cf. Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99–100 (2003). In rare situations, direct evidence might show that a defendant knew an inmate would try to commit suicide. A jail doctor, for example, might have diagnosed the inmate as suicidal. *See Comstock*, 273 F.3d at 704; *see also Galloway*, 518 F. App'x at 333–34; *Perez*, 466 F.3d at 425; *Linden*, 167 F. App'x at 427.

Most of the time, though, officers will not admit that they knew of the strong likelihood that inmates would try to kill themselves. *See Stewart v. Warren Cnty. Bd. of Comm'rs*, 821 F. App'x 564, 570 (6th Cir. 2020). So an estate must often rely on "circumstantial evidence" to establish this knowledge. *Bonner-Turner*, 627 F. App'x at 407. This type of evidence can create a jury question about an officer's state of mind if the facts that the officer knew made it "obvious" that a strong likelihood existed that an inmate would commit suicide. *Farmer*, 511

U.S. at 842; *see Downard*, 968 F.3d at 600–01; *Stewart*, 821 F. App'x at 571; *Broughton*, 656 F. App'x at 57.

Yet our caselaw sets a "high bar" for plaintiffs who try to prove an officer's knowledge in this circumstantial way. *Downard*, 968 F.3d at 601. We have typically required evidence that an officer knew of an inmate's "suicide watch" classification or of other equally revealing facts. *Id.*; *see Cooper*, 222 F. App'x at 469. As one example, we found this high bar met when an inmate told officers that he was suicidal and needed to go to the hospital and when the officers knew that he had recently been released from a mental-health facility. *See Bonner-Turner*, 627 F. App'x at 408–10. As another example, we found the bar met when an officer knew of the inmate's past suicide attempts, knew that the inmate had recently been placed on suicide watch, and knew that the inmate was complaining of pain and crying out to go to the hospital. *See Schultz v. Sillman*, 148 F. App'x 396, 401–03 (6th Cir. 2005).

The facts of many other cases, by contrast, have fallen short. We, for instance, granted summary judgment to an officer even though she knew that the deceased inmate seemed despondent. *Downard*, 968 F.3d at 601–02; *see also Baker-Schneider*, 769 F. App'x at 193–94. Likewise, we granted summary judgment to medical staff even though they knew that the deceased inmate had been suffering from drug withdrawals and refusing medication and meals. *See Broughton*, 656 F. App'x at 57–58; *see also Stewart*, 821 F. App'x at 571–72; *Grabow*, 580 F. App'x at 310–11. And we granted summary judgment to a jail doctor who knew of an inmate's prior attempt to harm himself and recent suicidal thoughts because the inmate had said that he no longer felt suicidal. *See Nallani*, 665 F. App'x at 507–08; *see also Mantell*, 612 F. App'x at 303, 306–07; *Starcher v. Corr. Med. Sys., Inc.*, 7 F. App'x 459, 465 (6th Cir. 2001).

B

Under these clearly established rules, qualified immunity shields the Officers from liability here. We opt not to resolve the objective element given the uncertainty in our caselaw on what it requires. Nevertheless, Lawler's father lacks evidence from which a reasonable jury could find that the Officers believed there was a strong likelihood that Lawler would take his

life. Section 1983 permits Lawler's father to hold each of the three Officers liable only for his or her own conduct, not for the conduct of the others under a vicarious-liability theory. *See Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 934 (6th Cir. 2020). We thus will consider the evidence about each Officer's state of mind in turn. *See Stewart*, 821 F. App'x at 570.

### 1. Futrell

No reasonable jury could find that Futrell subjectively concluded that Lawler was strongly likely to kill himself. *See Downard*, 968 F.3d at 601. To begin with, Lawler's father has cited no direct evidence that Futrell believed that Lawler posed a significant suicide risk. To the contrary, the direct evidence all points in the opposite direction. Futrell interacted with Lawler only once when booking him into the jail weeks before his suicide. After speaking to him during that intake process, she decided that "suicide wasn't on his mind" based on his "demeanor and how [he was] talking[.]" Futrell Dep., R.92-6, PageID 2201, 2218. She thus testified to her belief that Lawler was not suicidal.

Lawler's father instead attempts to make out a circumstantial case. But he lacks the type of "circumstantial evidence" that could permit a jury to find that Futrell really believed that Lawler would commit suicide despite what she said in her deposition. *Stewart*, 821 F. App'x at 570. Lawler's father relies on two pieces of evidence to establish Futrell's knowledge. Neither suffices.

*First*, he argues that Futrell learned that Lawler had attempted suicide before. According to Futrell, Lawler said that this attempt occurred over 15 years ago "when he was young and experimenting." Futrell Dep., R.92-6, PageID 2200. That said, a police report summarizing an interview with Futrell immediately after Lawler's suicide lacked this level of detail about what he had said. The report noted only that the suicide "had been over two years ago[.]" Rep., R.91-7, PageID 1952. According to Lawler's father, the report's conclusory statement creates a factual dispute over whether Lawler disclosed that the suicide happened in his youth (rather than just two years ago).

We need not resolve this claimed factual dispute.  Even if Lawler's prior attempt happened only two years before his suicide, that prior attempt would not have made it "obvious" that Lawler was strongly likely to commit suicide while at the jail.  *Downard*, 968 F.3d at 600.  We must consider this prior attempt against the other evidence.  And Lawler stated during the intake process that he was *currently* "not suicidal or having suicidal thoughts."  Futrell Dep., R.92-6, PageID 2207.  Futrell also learned that he was not currently suffering from any drug or alcohol withdrawals.  Lawler instead came across as "happy" and "upbeat."  *Id.*, PageID 2218–19.  Rather than raise suicidal thoughts, he repeatedly asked about getting released in time for a "wrestling match" that he had scheduled for the next day.  *Id.*, PageID 2210, 2219.

Because Lawler "denie[d] feeling suicidal at intake" and presented no other obvious signs of risk, our caselaw bars the claim that Futrell's knowledge of his years-old suicide attempt creates a jury question over her subjective mindset.  *Downard*, 968 F.3d at 601.  Take *Mantell*.  There, the officers knew that the inmate had tried to commit suicide before and that his girlfriend had opined that they should place him on suicide watch.  612 F. App'x at 306–07.  Yet we held that this inmate did not present an obvious suicide risk because he had a "calm demeanor" and told intake officers that he was not suicidal.  *Id.*  Or take *Starcher*.  There, a behavioral specialist knew that the inmate had twice tried to commit suicide and had been told that he should be "watched."  7 F. App'x at 465.  Yet we held that the inmate did not present an obvious suicide risk because the inmate did not come across as suicidal during the specialist's evaluations of him.  *Id.*  This case follows the same pattern.  Even though Lawler had tried to commit suicide sometime in the past, his demeanor and responses during the intake process would prohibit a jury from finding it "obvious" that a "strong likelihood" existed that he would commit suicide.  *Downard*, 968 F.3d at 600.

*Second*, Lawler's father argues that Futrell learned of general facts about Lawler's background during the intake process that qualified as "suicide risk factors[.]"  Appellee's Br. 33.  For example, Futrell learned that Lawler suffered from bipolar disorder and that he was on oxycodone and Xanax (among other medications).  She also learned that he had experienced drug and alcohol withdrawals in the past.  And she learned that he had once suffered a head injury that required hospitalization.

Our caselaw likewise forecloses any reliance on these generic risk factors. Plaintiffs often argue that a jury question exists over an officer's state of mind because the officer knew of facts showing that the inmate "fit[] the profile" of those who generally pose suicide risks. *Barber*, 953 F.2d at 239; *see Downard*, 968 F.3d at 601; *Mantell*, 612 F. App'x at 307; *Crocker ex rel. Tarzwell v. County of Macomb*, 119 F. App'x 718, 721, 723 (6th Cir. 2005) (per curiam). In *Crocker*, for example, a plaintiff alleged that an inmate "fit" this suicide "profile" because, among other things, he had a substance-abuse problem and had attempted suicide in the past. 119 F. App'x at 721. But we held that reliance on these generic factors did not permit the plaintiff to obtain a jury trial about an officer's "knowledge of a particular detainee's high suicide risk[.]" *Id.* at 723. Rather, plaintiffs must present evidence that an officer knew of more "specific" facts showing a particular inmate's high suicide risk. *Barber*, 953 F.2d at 239. As a result, Futrell's knowledge that Lawler's background may have made him a "member[]" of "a high-risk group" does not suffice for a jury to find that Futrell knew he was strongly likely to commit suicide. *Downard*, 968 F.3d at 601.

Lawler's father misreads the case on which he relies for the opposite conclusion: *Troutman*. There, we looked to various "suicide risk factors" to decide whether the plaintiff had met *Farmer*'s objective (not its subjective) element. *Troutman*, 979 F.3d at 484–85. When, by contrast, we turned to whether the defendant officer knew of the risk of suicide, we pointed out that he all but admitted as much. *Id.* at 479–80, 485–86. No similar smoking-gun evidence exists here.

One final point. Lawler's father argues that Futrell behaved recklessly by failing to identify the prior suicide attempt on Lawler's medical-screening form. Indeed, Nurse Shearon found it "[u]nacceptable" that Futrell did not disclose the attempt to her. Shearon Dep., R.92-11, PageID 2683. Another officer also opined that Futrell should have listed the prior attempt in the "note section" on the form. Daniel Dep., R.92-23, PageID 3428. But an officer who acts negligently or who merely fails to follow jail policies does not thereby possess the state of mind required for a deliberate-indifference claim. *See, e.g.*, *Stewart*, 821 F. App'x at 570; *Grabow*, 580 F. App'x at 310. And this evidence about Futrell's conduct has little (if any) relevance to whether she knew that Lawler was likely to commit suicide. It instead concerns a different

requirement: whether Futrell responded unreasonably to a strong risk of suicide that she knew of. *Farmer*, 511 U.S. at 844; *Galloway*, 518 F. App'x at 334–35. Because Lawler's father has not created a jury question over Futrell's state of mind, we need not consider whether she acted unreasonably by disregarding Lawler's prior suicide attempt.

## 2. Wiggins

We reach the same conclusion for Officer Wiggins. Until Wiggins saw Lawler hanging in Cell 90, no reasonable jury could find that she believed that Lawler was strongly likely to kill himself. *See Downard*, 968 F.3d at 601. As with Futrell, Lawler's father has identified no direct evidence that Wiggins harbored the required state of mind. Rather, she testified that she never believed that Lawler would commit suicide because he always acted with "bravado" and self-confidence around the jail staff. Wiggins Dep., R.92-16, PageID 3153.

So Lawler's father again tries to make out a circumstantial case. He suggests that, at two times on the day that Lawler took his life, it was "obvious" that Lawler was strongly contemplating suicide. *Downard*, 968 F.3d at 600. But the evidence at both times falls short.

*Time One*: Lawler's father first argues that Lawler's strong suicide risk was obvious for the six or so hours that Wiggins housed Lawler in Cell 90. During this time, Wiggins knew that Lawler had suffered a cut on his forehead after getting into a fight. She knew that he wanted to go to the hospital. She knew that Nurse Shearon had denied this request but had ordered that Lawler remain in the intake area over the weekend. And, as the afternoon turned into evening, she knew that Lawler had been screaming and hitting his cell door for about six hours. According to Wiggins, Lawler's conduct was "very unusual" for him and represented a "drastic change" from his demeanor during their prior interactions. Wiggins Dep., R.92-16, PageID 3141, 3189.

Yet these facts do not meet our "high bar" to obtain a jury trial about Wiggins's state of mind through circumstantial evidence. *Downard*, 968 F.3d at 601. We again must consider Wiggins's knowledge of these facts against the other evidence. She knew that Nurse Shearon did not assign Lawler to the intake area to place him on any "suicide watch[.]" *Id.* Rather, Shearon assigned him there in case his cut started "bleeding again" or he showed other physical

effects from the fight.  Wiggins Dep., R.92-16, PageID 3094, 3096.  Lawler also did not express suicidal thoughts or threaten to harm himself at any point.  When Shearon checked on him shortly before noon, he did not "indicate at all that he might be suicidal[.]"  Shearon Dep., R.92-11, PageID 2692.  And although Lawler complained about Cell 90 and the jail's refusal to take him to the hospital over the next six hours, he never said a word about harming himself.  Unlike Futrell, Wiggins also did not know that Lawler had attempted suicide in the past.  Nor did she know about his previous head injuries, struggles with withdrawals, or medications.

To grant a jury trial on these facts, then, we would have to conclude that it was "obvious" that Lawler would commit suicide because the jail housed him in a special area and because he loudly complained about this housing and his injury.  But our caselaw prohibits that conclusion. First consider the fact that Lawler was housed in a special area.  We have rejected arguments that a jury could infer an officer's knowledge of a strong suicide risk simply because the officer knew that the inmate had been placed in an isolation or observational cell.  *See Downard*, 968 F.3d at 602; *Stewart*, 821 F. App'x at 571; *Galloway*, 518 F. App'x at 335–36.  These cases have reasoned that a jail might segregate inmates for a host of reasons other than suicide, such as the need to protect them from fellow inmates.  *Downard*, 968 F.3d at 602.  And unlike the officers in some of these cases, Wiggins affirmatively knew that Shearon had *not* assigned Lawler to an intake cell based on suicide concerns.  *Cf. id.*; *Cooper*, 222 F. App'x at 469–70; *Starcher*, 7 F. App'x at 465.

Next consider the fact that Lawler repeatedly screamed and struck his cell door on the afternoon that he took his life.  Our court has likewise rejected arguments that this disruptive behavior revealed a strong suicide risk—at least where the inmate did not express any suicidal thoughts.  *See Linden*, 167 F. App'x at 422; *Gray*, 399 F.3d at 614–16; *see also Stewart*, 821 F. App'x at 567, 570–72.  In *Gray*, for instance, an "agitated" inmate damaged his cell, so officers moved him to a "suicide" cell to prevent further destruction.  399 F.3d at 614.  The inmate suffered from "mood swings" and chest pains later in the day.  *Id.*  Officers thus moved him to a cell in the hospital area.  *Id.* at 614–15.  While there, the inmate started "banging on his cell door and yelling in an agitated state."  *Id.* at 615.  An officer did not offer the inmate any aid and merely handcuffed him to stop this disruption.  *Id.*  The inmate committed suicide a short

time later.  *Id.*  We held that the inmate's loud and aggressive behavior did not show an obvious suicide risk because the inmate complained only about his "physical" condition and did not threaten to harm himself.  *Id.* at 616.  Lawler's case requires the same result.  His complaints were "of a physical nature," and he never said anything about suicide.  *Id.*

*Time Two*: At the least, Lawler's father next suggests, a jury could find Wiggins liable in the minutes before she discovered Lawler hanging in his cell.  He argues that she knew that Lawler posed a strong suicide risk when Gonzalez told her around 6:30 p.m. that they "need[ed] to go" into Lawler's cell because "something was going wrong."  Wiggins Dep., R.92-16, PageID 3209–10; Gonzalez Dep., R.92-37, PageID 4499–500.  Taking the facts in the light most favorable to Lawler's father (as we must at this stage), we must accept the testimony of the inmate in the neighboring cell who allegedly overheard this conversation.  The inmate stated that Gonzalez told Wiggins that Lawler was not "moving or nothing."  Jones Dep., R.92-5, PageID 2124.  Wiggins allegedly responded: "he's probably faking it, he's a good actor, that's what he do."  *Id.*, PageID 2126.  And "three to four minutes" allegedly elapsed between the time the inmate heard this comment and the time he heard an officer in the cell exclaim "oh, shit, he hung himself."  *Id.*

This alternative argument contains two problems.  As for the first problem, the alleged "faking" comment would, at most, allow a jury to find that Wiggins guessed that Lawler "*may*" have been committing suicide (or at least suffering from some other health condition).  *Galloway*, 518 F. App'x at 336.  Yet it is not enough that Wiggins subjectively knew of a "*possibility* of suicide, or even a *likelihood* of suicide[.]"  *Id.*  Rather, a jury must be able to find that Wiggins concluded that a "*strong likelihood* of suicide" existed.  *Id.*  And the purported off-hand remark would not allow a jury to find that demanding state of mind.  Before this time, Wiggins lacked any grounds to believe that Lawler would harm himself.  Indeed, she had just seen Lawler moving "10 or 15 minutes" before they entered his cell.  Wiggins Dep., R.92-16, PageID 3163–64.

Wiggins's lack of any prior knowledge that Lawler posed a suicide risk distinguishes this case from *Schultz*.  There, an officer heard an agitated inmate cry out in pain and say he needed to go to the emergency room.  148 F. App'x at 398.  The officer allegedly responded by saying

that the inmate was "faking" and refused to take him anywhere. *Id.* The inmate later committed suicide. *Id.* We held that a jury could find that the officer knew of a strong suicide risk. *Id.* at 401–03. Why? The jury could find that the officer had "been aware" that the inmate had been previously placed on suicide watch and that the inmate's past suicide attempts had been linked to his pain (which he had been complaining of when he killed himself). *Id.* at 398, 402. Here, by contrast, Wiggins did not know of any "suicidal propensities" at all. *Id.* at 402.

As for the second problem, even if this statement could prove Wiggins's belief in the strong likelihood of suicide, Lawler's father still must show that she responded unreasonably to that risk. *Farmer*, 511 U.S. at 844; *see Galloway*, 518 F. App'x at 334–35. The record would not permit a jury to make that finding. In response to Gonzalez's request for assistance, Wiggins left her intake desk and walked through the secured door to the sally port and Lawler's cell. As she walked, she "called over the radio" for officers to unlock Lawler's cell door. Wiggins Dep., R.92-16, PageID 3210. She and Gonzalez then entered and found Lawler hanging. She screamed for scissors and tried to hold Lawler until Gonzalez cut him down. Other officers then performed CPR until EMTs arrived. Nothing about these actions was unreasonable. *Cf. Davis*, 6 F. App'x at 250.

Lawler's father responds with the neighboring inmate's testimony that "three to four minutes" went by between when he heard the "faking" comment and when he heard the Officers in Lawler's cell. Jones Dep., R.92-5, PageID 2126. According to Lawler's father, this allegation would allow a jury to conclude that Wiggins acted too slowly. We disagree. Lawler's father cites no evidence showing how long it would usually take to get from the intake desk through the locked sally-port door to Cell 90. Nor does he cite any evidence showing how long it would usually take to correspond with security officers to unlock a cell door. And he cites no evidence about the normal security precautions that officers must take before entering a potentially dangerous cell. *Cf. Cagle v. Sutherland*, 334 F.3d 980, 984 & n.7 (11th Cir. 2003). He even conceded that the "timing cannot exactly be known" here given that the jail's camera system did not work. Resp., R.90-1, PageID 1090. This inmate's speculative estimate about the time gap between two statements—without more—does not suffice for any jury to find the response unreasonable.

### 3. Gonzalez

*Farmer*'s demanding state-of-mind requirement also forecloses the claim against Officer Gonzalez. According to Lawler's father, a jury could find *both* that Gonzalez believed that Lawler was committing suicide when he first looked into Cell 90 *and* that he responded unreasonably by continuing to take out the trash. For a third time, however, Lawler's father lacks direct evidence of Gonzalez's subjective knowledge. Generally, Gonzalez testified that "[s]uicide . . . never came to [his] mind when" he saw Lawler because Lawler was an "outspoken guy" who "liked to entertain." Gonzalez Dep., R.92-37, PageID 4418. More specifically, he testified that he did not believe an "emergency" existed when he peered into Cell 90. *Id.*, PageID 4436, 4447.

So for a third time, Lawler's father tries to use circumstantial evidence to prove that Gonzalez really believed a strong likelihood of suicide existed. A hypothetical § 1983 plaintiff would certainly make out a strong circumstantial case that officers knew of an obvious risk of suicide if they looked through a cell window and clearly saw an inmate dangling from a noose. Lawler's father argues that it was equally "obvious" that Lawler was committing suicide based on the circumstances in which Gonzalez saw him. *Downard*, 968 F.3d at 600. But the facts here are not so clear-cut. Photos of the cell show that Gonzalez had to peer through a narrow window to attempt to see Lawler. As best he could tell, Lawler was standing on his cell bench with his back against the front wall. Lawler also had a towel over his head and neck, so Gonzalez could not see his face or neck. And Lawler did not respond when Gonzalez knocked.

Is Lawler's seemingly odd and unresponsive conduct enough to establish that Gonzalez believed that he was likely committing suicide? For a few reasons, our answer is no. To begin with, we have held that a jury could not make this inferential leap if an inmate's potentially suicidal conduct could be explained on other grounds. So, for example, we held that a plaintiff could not show an officer's knowledge of a strong likelihood of suicide even though the officer knew that the inmate had been issued a "suicide precautions blanket" and engaged in "odd behavior and aggression." *Galloway*, 518 F. App'x at 335–36. We reasoned that the jail might have issued this blanket to the inmate for "reasons unrelated to self-harm concerns," such as preventing the inmate from stuffing the normal sheets down the toilet. *Id.* at 336. Similarly, we

held that another plaintiff could not show an officer's knowledge of a strong likelihood of suicide even though he knew that the jail had placed the inmate in an "observational cell" and required him to wear a "bam bam gown"—an easy-to-tear gown designed to deter suicides. *Cooper*, 222 F. App'x at 462 & n.1, 469–70. We reasoned that "other explanations" (such as special medical needs) existed for the unique housing and clothing "besides the suicide watch explanation." *Id.* at 469; *see id.* at 462.

According to Gonzalez's undisputed testimony, "reasons unrelated to self-harm concerns" also could have explained Lawler's odd conduct. *Galloway*, 518 F. App'x at 336. Gonzalez thought that Lawler was simply "upset from the altercation that had happened." Gonzalez Dep., R.92-37, PageID 4438. In fact, the record is undisputed that it was "common" for inmates to stand in the "corner" of their cells if the inmates were "angry" when officers came by. *Id.*, PageID 4447, 4462–63. It was also a "trend" in the jail for inmates to put towels around their necks or heads. *Id.*, PageID 4409. And while Lawler had always seemed "upbeat" when speaking with Gonzalez in the past, Gonzalez assumed that his earlier "altercation" with the other inmate had left him in a dour mood. *Id.*, PageID 4421–22.

In addition, as compared to Futrell or Wiggins, Gonzalez had even less reason to believe that Lawler posed a suicide risk. Gonzalez did not know that Lawler had attempted suicide before. He did not know that Lawler had bipolar disorder, had suffered from drug withdrawals, and was on various medications. Nor is there evidence that Gonzalez knew of Lawler's disruptive afternoon behavior. Gonzalez had a "passing encounter" with Lawler when he saw him "sitting in intake" waiting to receive care before noon, and he had no other "interaction" with Lawler until taking out the trash. *Id.*, PageID 4424.

Lastly, both the district court's order and Lawler's father's representations in that court confirm this point. The district court suggested that a jury could hold Gonzalez liable because he "*recklessly* disregarded a strong risk" that Lawler was committing suicide. *Lawler*, 2022 WL 4587171, at *6 (emphasis added). Likewise, when responding to the Officers' summary of the undisputed facts, Lawler's father suggested: "While [Gonzalez] *might not have realized* Mr. Lawler was hanging, he had information necessary to make that determination." Resp., R.90-1, PageID 1087 (emphasis added). The district court and Lawler's father might be right that

Gonzalez recklessly failed to realize the urgency of the situation. Yet his failure "to alleviate a significant risk that he should have perceived but did not" does not permit us to hold him liable under *Farmer*'s rigorous standards. 511 U.S. at 838.

\* \* \*

Our conclusion that Lawler's father cannot hold the Officers liable under § 1983's qualified-immunity test says nothing about whether he could have held them liable under today's standards. It also "says nothing about whether [the Officers'] conduct was proper as a matter of good policy." *Johnson*, 79 F.4th at 622. And nothing we say here bars Tennessee or its jail administrators from holding correctional officers to more demanding standards of conduct as a matter of state law. *Cf. Farmer*, 511 U.S. at 837–38. But Lawler's father lacks the type of evidence that we have traditionally required to meet the stringent constitutional test that applied when Lawler tragically committed suicide. We thus reverse the district court's denial of qualified immunity to the Officers and remand for further proceedings consistent with this opinion.